[L. A. No. 937. Department One.—March 15, 1902.]

LOS ANGELES TERMINAL LAND COMPANY, Respondent, *v.* J. A. MUIR and THE SOUTHERN PACIFIC RAILROAD COMPANY, Appellants.

Deeds—Covenants Running with Land—Benefit—Burden—Personal Covenants.—A covenant in a deed, made for the benefit of the land conveyed, will run with the land, and inure to a grantee thereof. But a covenant between the grantor and grantee of a deed in fee, which merely imposes a burden of restrictions upon the grantee, and does not reserve or create any interest in the grantor, or establish a condition subsequent to the grant, and does not purport to inure to the protection of an assignee of the grantor, or to

bind the assignees of the grantee, is personal in its nature, and does not run with the land or charge an assignee of the grantee with such burden.

ID.—JURISDICTION OF EQUITY—ENFORCEMENT OF PERSONAL COVENANTS. —Equity has jurisdiction, in proper cases, to enforce personal covenants imposing restrictions upon the use of lands contained in grants thereof; but it will not enforce all such covenants that may be desired, and will not enforce them, unless the facts of the case justify equitable relief. In determining whether to enforce them or not the court will consider not only the effect which the use complained of would have upon the property of the plaintiff, but also the effect upon the interest of the public.

ID.—DEED TO YACHT CLUB—RESTRICTIONS UPON BUSINESS—PERSONAL COVENANT—USE FOR FERRY BY SUCCESSOR.—A covenant in a deed to a yacht club, that "in consideration of the conveyance," the lot should not "be used for any business or store purposes, other than for hotel or lodging-house, or club purposes," is a personal covenant, which only binds the yacht club during its tenure, and does not bind it affirmatively to use the lot for club purposes, nor preclude the use thereof for a ferry by a successor in interest, whose deed contained no restriction, where such use is not shown to be injurious to the remaining property of the original grantor, and is in its nature beneficial to the public.

ID.—INJUNCTION—BENEFIT TO PLAINTIFF'S PROPERTY.—An injunction will not lie in favor of such grantor against the vendee of the yacht club to restrain the use thereof for a public ferry, where it appears that the land granted was never used for club purposes, and that its use for ferry purposes by such vendee would be a benefit, and not an injury, to the remaining property of the plaintiff, and is in accord with the express design of the plaintiff to have land of which the land in question was a part used for ferry purposes.

ID.—NOTICE—BENEFIT OF ADJOINING ESTATE.—In the absence of any words in the deed, or any reference to a plan showing a general scheme of improvement, the grantees took their estate without notice, express or constructive, that the restriction inserted in the deed was intended for the benefit of the adjoining estate.

APPEAL from a judgment of the Superior Court of Los Angeles County. Lucien Shaw, Judge.

The facts are stated in the opinion of the court.

Bicknell, Gibson & Trask, for Appellants.

The covenant is a mere personal one, which does not run with the land nor bind the vendee of the grantee. (Civ. Code, secs. 1460-1463; *Lyford* v. *North Pacific Coast R. R. Co.*, 92 Cal. 65; *Norcross* v. *James,* 140 Mass. 188.)   Equity will not

enforce such a covenant as this. (*Norcross* v. *James,* 140 Mass. 188; *Brewer* v. *Marshall,* 19 N. J. Eq. 537;[1] *Tardy* v. *Creasy,* 81 Va. 553;[2] *Taylor* v. *Owen,* 2 Blackf. 301;[3] *Badger* v. *Boardman,* 16 Gray, 559.) Equity will not enforce a covenant designed to secure a monopoly of the ferry business for the plaintiff or its grantors. (*Chippewa Lumber Co.* v. *Tremper,* 75 Mich. 36;[4] and cases cited *supra.*)

Gibbon, Thomas & Halsted, for Respondent.

Covenants restricting trade are valid and enforceable if no unlawful restraint is imposed. (*Sanborn* v. *Rice,* 129 Mass. 387; *Whitney* v. *Union Ry. Co.,* 11 Gray, 359;[5] *Mann* v. *Stephens,* 5 Sim. 377; *Brooks* v. *Reynolds,* 106 Mass. 31; *Cowell* v. *Colorado Springs Co.,* 100 U. S. 55; *Nottingham Patent Brick etc. Co.* v. *Butler,* 16 Q. B. 778.) Equity will enforce covenants not running with the land where there is no adequate remedy at law. (*Hills* v. *Sherwood,* 48 Cal. 386; *Trustees* v. *Lynch,* 70 N. Y. 440;[6] *Whitney* v. *Union Ry. Co.,* 11 Gray, 359;[5] *Ladd* v. *City of Boston,* 21 Am. St. Rep. 484-508, and note.)

THE COURT.—This suit was brought by the respondent against said J. A. Muir, B. W. Foster, the Southern Pacific Company, a corporation, John Doe, and Richard Roe, to enjoin the defendants from using a certain lot situate on the harbor side of Terminal Island, in East San Pedro, as a ferry landing, contrary to the provisions of a certain deed executed by the plaintiff conveying the same to the Catalina Yacht Club, a corporation. At the trial the action was dismissed as to the Southern Pacific Company, B. W. Foster, and John Doe, and the Southern Pacific Railroad Company was substituted in place of Richard Roe. Upon the hearing a perpetual injunction was granted against defendants Muir and the Southern Pacific Railroad Company, as prayed for, and they appeal from the judgment. The record includes a bill of exceptions setting out the evidence, and the appeal was taken within sixty days after the judgment was entered. Numerous errors

[1] 97 Am. Dec. 679.          [4] 13 Am. St. Rep. 420.
[2] 59 Am. Rep. 677.          [5] 71 Am. Dec. 715.
[3] 20 Am. Dec. 115.          [6] 26 Am. Rep. 615.

of law, and particulars wherein the evidence is alleged to be insufficient to justify the findings, are specified.

The plaintiff is a corporation formed for the purpose of acquiring, owning, improving, renting, and selling real estate, building houses, etc., and in 1892 purchased Terminal Island, formerly known as "Rattlesnake Island." Said island is a long and narrow strip of land lying between the Pacific Ocean, on one side, and the navigable waters of San Pedro Bay, or harbor, on the other. The plaintiff granted to the Terminal Railroad Company, also a corporation, some fifty acres on the lower or westerly end of the island for railroad purposes, and easterly therefrom a right of way for said road, leaving between said right of way and the ocean a row of blocks for residence purposes, and pleasure-grounds along the beach, and on the other side of the right of way, between the right of way and the inner harbor of San Pedro, several blocks were platted and devoted to business purposes, and between these blocks and the inner harbor is a space not subdivided, except as to the lot affected by this controversy, which is located therein. Said lot has a frontage of sixty feet and a depth of two hundred feet, one-half of which is below the line of mean high tide, and extends to the line of mean low tide. This lot was conveyed by the plaintiff to the said Catalina Yacht Club in August, 1897, by a deed containing certain covenants, out of which has arisen the present controversy.

Plaintiff alleges that it purchased the property now known as Terminal Island, paying three hundred thousand dollars therefor, "for the purpose of improving the same, and using the same for railroad purposes, for the building and maintenance of wharves, landing-places for ferries across the said harbor of San Pedro, warehouses, lumber-yards, stores, and general business purposes, and for residential purposes, and for use as a pleasure resort upon the seashore"; that, for the purpose of adding to the value of plaintiff's remaining property (not granted to said railway company), the plaintiff caused to be inserted in the deeds executed for lots sold for residence purposes "a provision, condition, and covenant as follows,—to wit: It is hereby covenanted and agreed by and between the parties hereto, that, in consideration of this conveyance, no saloon business or business of vending malt, vinous, or spirituous liquors, shall ever be carried on upon said

lot, neither shall said lot be used for any business or store purposes other than for hotel or lodging-house.''

It is further alleged that the plaintiff "resolved and decided" to devote that portion of its lands lying between the said right of way and the shores of the bay of San Pedro "to business purposes, such as locations and sites for stores, warehouses, lumber-yards, approaches to wharves, landing-places for ferries across said San Pedro Harbor, etc.''; that after selling two lots lying on the harbor side of the railway, it withdrew from sale all of its lands on that side of the railway, determining for a time to retain the title and lease the same until after the improvements to the harbor undertaken by the national government should be completed; that in May, 1897, the Catalina Yacht Club began negotiations for the lot concerning which this controversy has arisen, and in view of numerous advantages, particularly alleged, such as regattas, to which visitors would be attracted, thus making business for the railroad and enhancing the value of plaintiff's property, the probability of members of the club buying residence lots, etc., it sold and conveyed said lot on the harbor side to said yacht club, and in said deed of conveyance inserted a covenant identical with that inserted in deeds to residence lots, hereinbefore quoted, except that there was added thereto the words "or club purposes.''

Said lot was never used or improved by the yacht club, but the club afterwards sold and conveyed it to B. W. Foster, and Foster afterwards conveyed it to the Southern Pacific Company, and that company afterwards sold and conveyed it to the defendant the Southern Pacific Railroad Company, the present owner. The deed from the yacht club to Foster contained the same covenant as that inserted in the deed of the plaintiff to it, but in the two subsequent deeds it was not inserted. Each of said deeds was duly recorded; and it is alleged in the complaint, and found by the court, that in taking said conveyance Foster acted as the agent of the Southern Pacific Company, and that that corporation acted as the agent of the Southern Pacific Railroad Company.

Defendant Muir obtained a franchise, granted by the board of supervisors of Los Angeles County, to construct, operate, and maintain a ferry across the harbor of San Pedro, and has obtained the right from the Southern Pacific Railroad Com-

pany to use said lot for ferry purposes. Said Muir has, at a large expense, constructed a ferry-landing on the opposite side of the bay, on the property of said Southern Pacific Railroad Company, and nearly completed the landing on the lot in question, and has leased a ferry-boat for the purposes of said ferry, at a cost of one hundred dollars per month.

The answer is very full, and puts in issue all the material allegations of the complaint so far as they affect adversely the claims of defendants. Much of the evidence consists of a stipulation of facts made for the purposes of the present trial only.

The covenant inserted in the deed from the plaintiff to the Catalina Yacht Club for the lot mentioned therein is not one that runs with the land. It was not made for the benefit of the lot conveyed, but purported to impose a burden thereon by restricting its use; and while a benefit will pass with the land to which it is incident, a burden will adhere exclusively to the original covenantor, unless a privity of estate or tenure subsist or be created between the covenantor and covenantee at the time when the covenant is made. (*Webb* v. *Russel,* 3 Term Rep. 393, 402; *Hurd* v. *Curtis,* 19 Pick. 459; *Bally* v. *Wells,* 3 Wils. 25, 29.) Here there was no privity of estate between the parties, for by the same instrument which contained the covenant the fee was conveyed to the covenantor. Under the feudal system the transfer of every estate created privity of tenure between the parties, and hence both the burden and the benefit of all covenants made by either bound and profited the assignee of either as an incident to the land. "But when the statute of *quia emptores* abolished subinfeudation this privity no longer existed in cases where a fee was transferred and no reversion was left in the donor, and it became a rule that covenants which imposed any charge, burden, or obligation upon the land were held not to be incident to it, and therefore incapable of passing with it to an assignee. . . . But, on the other hand, if the covenant were one intended to *benefit* the land, it was considered to be incident to and run with the land, and, therefore, whoever might become the owner of the land would also become entitled to the benefit of the covenant." (Rawle on Covenants for Title, p. 314.) So our Civil Code (sec. 1462) provides: "Every covenant contained in a grant of an estate in real property,

which is made for the *direct benefit* of the property, or some part of it then in existence, runs with the land"; and section 1461 of the Civil Code provides that "the only covenants which run with the land are those specified in this title, and those which are incidental thereto."

The covenant here in question is one which not only does not, as matter of law, run with the land, but it purports on its face to be a personal covenant, not binding upon the assigns of the covenantor, nor inuring to the benefit of the successors or assigns of the covenantee, and it is quite clear that no action at law upon the covenant in question could be maintained by the plaintiff against the defendants, or either of them, and this seems to be conceded by respondent. It is contended on behalf of the respondent, however, that a personal covenant or agreement will be held valid and binding, in equity, on a purchaser from the covenantor taking the estate with notice. That there are personal covenants enforceable in equity against the grantee of the covenantor, is conceded; but that proposition is far from being applicable in all cases, for, if it were, it would result that all purely personal covenants in any manner relating to land would have the same effect as those which do run with the land. The vendor and purchaser of real estate have the undoubted right to bestow such benefits and impose such burdens and restrictions upon the land sold and that retained by the seller as they see proper, unless some wrong or injury thereby results to third parties, or it be against public policy. As between themselves, in the absence of fraud or mistake, they are conclusively bound by their personal covenant, if it be not against public policy.

In *Brewer* v. *Marshall*, 19 N. J. Eq. 537,[1] the grantor of land covenanted that neither he nor his assigns would sell any marl from off the premises adjoining the tract conveyed, and it was held that the covenant would not be enforced in equity against the grantee of the land intended to be burdened by the covenant,—for the only principle upon which such a covenant could rest would sanction the annexation to the land of any stipulation which human caprice could devise; and in the opinion Beasley, C. J., quoted the following passage from *Keppell* v. *Bailey*, 2 Mylne & K. 517, illustrating the incon-

[1] 97 Am. Dec. 679.

venience of giving such latitude to the power of owners of lands: "Every close, every messuage might thus be held in a different fashion, and it would be hardly possible to know what rights the acquisition of any parcel conferred, or what obligations it imposed. The right of way, or of common, is of a public as well as of a simple nature, and no one who sees the premises can be ignorant of what all the vicinage knows. But if one man may bind his messuage and land to take lime from a particular kiln, another may bind his to take coals from a certain pit, while a third may load his with obligations to employ one blacksmith's forge; besides many other restraints as infinite in variety as the imagination can conceive."

In *Norcross* v. *James,* 140 Mass. 188, K conveyed to F a quarry in L, bounded by other land of K, with a covenant as follows: "And I do for myself, my heirs, executors, and administrators, covenant with the said F, his heirs and assigns, that I will not open or work, or allow any person to open or work, any quarry or quarries on my farm or premises in said L." A became possessed of the quarry conveyed to F, and B of the surrounding land referred to in the covenant, and A brought a bill in equity to restrain B from quarrying stone on said surrounding land. It was held the bill could not be maintained. It was said by the court: "Equity will no more enforce every restriction that can be devised than the common law will recognize as creating an easement every grant purporting to limit the use of land in favor of other lands."

Conceding, therefore, that personal covenants imposing restrictions upon the uses of land contained in grants thereof may, in proper cases, be enforced in equity, the question remains whether the facts of this case justifies the relief granted by the court below.

The plaintiff is the grantor in whose deed to the yacht club the covenants in question were inserted. As grantor it could determine the conditions or restrictions under which it would part with the title and the covenants it would require of the vendee. It could have inserted a condition subsequent, the violation of which would involve a forfeiture of title, and such condition would have been effective against the assigns of the grantee, or it could have inserted a covenant which would have inured to the protection of plaintiff's grantee, or

successor in interest, and would have expressly bound the assigns of the yacht club. It did not do either, but contented itself with a covenant, in its terms purely personal, purporting to create a restriction upon the use of the property so long only as the vendee should retain the title, and by such agreement they would, at law, each be conclusively bound; and in determining any alleged equity arising out of this covenant, or agreement, or its alleged violation, its legal effect must not be lost sight of; for where a covenantor limits, by its terms, the legal duration of his covenant, there must be a clear and convincing equity to justify its continuance beyond the time so limited. It cannot be assumed that it was intended by either party to the covenant that it should be continued for all time, or "until the island should be swallowed by the sea." The covenant was not that the yacht club *would* use it "for hotel, lodging-house, or club purposes," for any time or at all; and even if such had been the form of the covenant, surrounding conditions might so change that a court of equity would relieve the covenantor and the property from such restriction to its use, since public policy requires that land should not be unnecessarily burdened with permanent or long-continued restrictions, depreciating the value of its use to the owner, as well as its selling value in the market; and as there is no personal contract relation between the parties to this action, the plaintiff is not entitled to relief against the defendants, unless the evidence shows with reasonable certainty that the *use* of the lot for *ferry purposes* would materially injure the remaining property of the plaintiff.

The alleged inducement to the sale of the lot by plaintiff to the yacht club, that the use of it for purposes incident to yachting, by which visitors would be attracted and others induced to purchase lots, was wholly defeated by the failure of the club to devote it to such uses. The club might have retained the lot for all time, without using it for any purpose, and the plaintiff would have been without remedy, notwithstanding the mere failure of the club to use it for yachting purposes may have resulted in preventing the anticipated increase of visitors and sale of residence lots; and, therefore, if injury has resulted to the plaintiff, it accrued from the yacht club's failure to use it for yachting purposes, and not merely from the fact of its appropriation to other uses. If,

therefore, the use of the lot for ferry purposes would entitle the plaintiff to an injunction preventing its use for such purposes, it must be because such use would be, of itself, an injury to plaintiff's remaining property, and not because of its not being used for yachting purposes, which could not be compelled; and hence the judgment of the court below is not mandatory, requiring the use of the lot for yachting purposes, but prohibitory, enjoining its use for ferry purposes.

The question, therefore, is whether the use of said lot for ferry purposes is an injury, or *such* an injury to the remaining property of the plaintiff as to authorize the relief granted by the court below.

It has already been stated that the land lying between the railroad and the ocean was devoted to residence purposes, and the covenant here under consideration, omitting the words "or club purposes," was inserted in most, if not all, the conveyances of lots on that side of the island after 1896, whilst between the lot here in question and the railroad several blocks were platted and devoted to business purposes, and as to the ground between the railroad and the bay, including said blocks and the portion not platted, it is alleged in the complaint that the plaintiff decided to devote it "to business purposes, such as locations and sites for stores, warehouses, lumber-yards, approaches to wharves, landing-places for ferries across said San Pedro Harbor; etc." The purpose, therefore, to which the defendant Muir was proceeding to devote the lot in question was one of the purposes named by the plaintiff to which it intended to devote all its land lying between the railroad and the bay, and in no wise injured the residence portion on the ocean side of the railroad; for it is obvious that it could make no difference to the owners of residence lots, which were all on the other side of the island, whether the lot in question should be used for ferry purposes by defendant Muir or by the plaintiff. Nor could the use of this lot by defendant Muir for ferry purposes affect the remainder of plaintiff's land injuriously, since this was one of the purposes to which the whole was devoted. On the contrary, it may be safely assumed that in selecting "ferry purposes" as one of the uses for which the land next the bay was intended, the plaintiff did not intend a use that would be injurious to any of its property, but, on the contrary, that a

benefit to the whole of its property and interests would result from such use. It would give a convenient mode of transit across the bay by which the business as well as the residence portion of the island would be benefited, as it would give access to the island by two routes instead of one. Indeed, the fact that the plaintiff "decided" that one of the purposes for which it intended to devote this land was for "ferry purposes" is evidence of the affirmative fact that a ferry would benefit its property and business interests. It is not suggested, even on behalf of the plaintiff, that there is not business sufficient to justify the establishment and maintenance of a ferry, whilst from the fact that a franchise was granted therefor by the board of supervisors, and that defendant Muir has expended a large amount toward its construction, it may be fairly inferred that the interests of the public at large require its construction. There would therefore appear to be no possible ground upon which it could reasonably be contended that the construction of the ferry by the defendant, and the use of the lot in question for that purpose, could injure the property of the plaintiff, or that of any property-holder upon the island.

It may be conceded that the property and interests of the plaintiff would have been benefited in the past by the use of the lot for yachting purposes, and the evidence seems to have been almost, if not quite, exclusively devoted to establishing that fact; but we find in the record no evidence that the use of it for ferry purposes would cause such injury to plaintiff's remaining property as to justify a court of equity in enjoining its use for that purpose.

Mr. Rule was called by plaintiff, and testified that in 1896 a policy was adopted as to the sale of residence lots and the withholding from sale of the lots between the railroad and the bay, "for warehouse and other purposes appertaining to the railway"; that their decision had reference to the act of Congress for the improvement of the harbor; that negotiations were opened with the yacht club in the summer of 1897, at which time they were endeavoring to sell residence lots on the ocean side of the island; that the fact that the yacht club was to own this lot and maintain a boat-house on it had an effect upon the value of residence lots; that for the purpose of making the residence lots attractive a pleasure wharf and side-

walks were built and lights contracted for; that certain restrictions were inserted in the conveyances of residence lots; that four lots on the residence side were donated to said yacht club for a club-house site, with covenants that it should be used for that purpose and no other, and with a provision for forfeiture of title in case it should not be used for such purposes, but with a further condition that, upon payment at any time within five years, plaintiff would convey to it two of said lots for $400, or all for $800, free from ''all incumbrances, forfeitures, uses, conditions, or covenants in this deed and agreement mentioned.'' This agreement expressly bound the successors and assigns of both parties, and bears the same date as the deed to the lot in controversy. Said witness also estimated the value of said lot at the time it was conveyed to the yacht club at six thousand dollars, the reason being that the land would become very valuable for all purposes appertaining to a harbor when the improvements should be completed, and it was the intention to hold it for such purposes; that between the railroad and the ocean three hundred and forty-eight lots were laid out, of which two hundred and nine remain unsold; that the value of the lots on the harbor side are not now of less value than in 1897. There were some other witnesses called by plaintiff who gave testimony of the same character tending to corroborate the evidence given by Mr. Rule. All of the evidence given by Mr. Rule, as well as the other witnesses, was received over defendants' objections, and exceptions were reserved. With the exception of testimony tending to show the situation of the property of the plaintiff, and the purposes to which it is adapted, and the situation of the lot in question, and the purposes to which it is adapted, we think the testimony given by these witnesses was wholly immaterial, and defendants' objections should have been sustained. The title of the defendants to the lot is not questioned, and, as we have seen, their right to devote it to any purpose which is not injurious to the plaintiff's remaining property cannot be doubted. None of the witnesses testified that the operation of the ferry, and the use of the lot for that purpose, would depreciate the value of any of plaintiff's property to any extent or at all; nor can it be material that the lot was sold to the yacht club for less than its value, for neither the title to the lot nor its use is thereby affected. ,

The validity of the covenants and restrictions inserted in the deeds to the residence lots need not be questioned. They were inserted for the benefit of the other lots which were devoted to the same purpose, and were reasonable and adapted to the purpose intended. Such restrictions are held to create a servitude in favor of the other lots devoted to the same purpose. (Washburn on Easements, 4th ed., sec. 115.) "The only restriction on this right is, that it shall be exercised reasonably, with due regard to public policy, and without creating any unlawful restraint of trade." (*Whitney* v. *Union Ry. Co.*, 11 Gray, 359.[1])

But in the case before us there is no such relation between the lots devoted to business purposes as exists between contiguous lots used for residence purposes only. The business lots are not all devoted to the same purpose, but to diversified kinds of business. Some kinds of business, it is true, may be prohibited. A powder-mill, a slaughter-house, and other such uses might well be excluded, upon the ground that they are dangerous or offensive, and thus prevent the use of other property for any business purpose, and destroy its value. But it is not pretended that the use of this lot for ferry purposes would in any way injure the use of any other business lot owned by the plaintiff. No easement in favor of other lands of the plaintiff was created by the covenant. It compelled no use of the land by the covenantor for any purpose, and conferred no right upon the owner of other lands in respect to the land granted. An easement is "an interest in land created by grant or agreement, express or implied, which confers a right upon the owner thereof to some profit, benefit, dominion, or lawful use out of or over the estate of another." (*Huyck* v. *Andrews*, 113 N. Y. 81, 90.[2]) There being no easement, there could be no servitude, which is defined to be "a right which subjects a land or tenement to some service for the use of another land or tenement which belongs to another master." (Bouvier's Law Dict., title "Servitude.") The servitudes that may be created upon land are enumerated in section 801 of the Civil Code.

In determining whether a court of equity should grant the relief demanded by the plaintiff, the use to which the defendants were about to devote it should be considered, not only as

---

[1] 71 Am. Dec. 715.      [2] 10 Am. St. Rep. 432.

to the effect such use would have upon the plaintiff's property, but its effect upon the interest of the public.

A ferry is a quasi-public use. A franchise for a ferry is granted only by the board of supervisors. (Pol. Code, sec. 2843.) Corporations for the purpose of operating a ferry may be formed under the statute. (Civ. Code, sec. 528 et seq.) The right of eminent domain may be invoked for the acquisition of landings for ferry purposes. (Code Civ. Proc., sec. 1238, subd. 4.) If, therefore, the Southern Pacific Railroad Company had refused to give defendant the right for a ferry-landing upon the lot in question, such right might have been acquired under the statute by payment of the damages assessed in the manner provided by the statute; and in such case we think it clear that the Terminal Land Company could not have recovered damages for the appropriation of the lot in question, upon the ground of injury to its remaining property; and if so, it would follow that a court of equity should not, by granting an injunction, compel defendant Muir to resort to proceedings in eminent domain to acquire a right which the owner of the lot is willing to grant, and has granted, upon terms mutually agreed upon. Nor do we perceive such difference in its effect upon plaintiff's remaining property upon the bay shore, or upon any part of the island, between its use for ferry purposes and the use of the same property for the anchorage and landing of yachts as would justify the granting of an injunction. The uses are similar in character so far as the lot is concerned, while the benefits resulting to the business and property interests of the plaintiff would appear to be enhanced in a much greater degree by its use as a ferry-landing, and there is no substantial evidence to the contrary.

There is no suggestion in the record that the plaintiff is about to establish and operate a ferry, or desires to do so at any time in the future, other than the fact that one of the purposes to which it decided to devote its property on the bay shore is that of a ferry; but the existence of defendant Muir's ferry would not prevent the operation of a ferry by the plaintiff, though competition might make such use less remunerative. Neither the covenant nor the perpetual injunction granted by the court below makes the use of plaintiff's prop-

erty more inconvenient for ferry purposes, or in any way affects the use or occupation of it; it simply tends indirectly to increase the value of such use by excluding a competitor; and, as said in *Norcross* v. *James*, 140 Mass. 188, "this covenant illustrates the further meaning of the rule against unusual incidents. If it is of a nature to be attached to land, as the plaintiff contends, it creates an easement of monopoly, —an easement not to be competed with,—and in that interest alone a right to prohibit an owner from exercising the usual incidents of property."

As to notice, there is no evidence that the defendants, or either of them, had any as to the purposes to which the plaintiff intended to devote the land lying between the railroad and the bay, or any inducement to the sale of the lot in question to the Catalina Yacht Club, or of other matters affecting plaintiff's property, except that derived from the records. "In the absence of any words in the deed to this effect, or any reference to a plan showing a general scheme of improvement, the grantees took their estate without any notice, express or constructive, that the restriction was intended for the benefit of the adjoining estate." (*Skinner* v. *Shepard,* 130 Mass. 180; *Jeffries* v. *Jeffries,* 117 Mass. 184; *Jewell* v. *Lee,* 14 Allen 145;[1] *Badger* v. *Boardman,* 16 Gray, 559.)

We conclude that the evidence does not justify the finding (No. 23), to the effect, that the use of said lot by the defendants, or either of them, for the purposes of a ferry-landing would greatly or irreparably injure the plaintiff, or that such use would greatly decrease the value of plaintiff's other real property on said island, or would greatly or irreparably injure the plaintiff in the benefits and value of its other land. On the contrary, we conclude that the evidence does not show that the use of the lot by defendants for ferry purposes shows any injury that would authorize the relief granted by the court below.

The judgment is reversed.

Hearing in Bank denied.

[1] 92 Am. Dec. 744.