FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

CEDAR POINT NURSERY; FOWLER
PACKING COMPANY, INC.,
*Plaintiffs-Appellants*,

v.

GENEVIEVE SHIROMA; CATHRYN
RIVERA-HERNANDEZ; SANTIAGO
AVILA-GOMEZ, Esquire; ISADORE
HALL III,
*Defendants-Appellees.*

No. 16-16321

D.C. No.
1:16-cv-00185-
LJO-BAM

OPINION

Appeal from the United States District Court
for the Eastern District of California
Lawrence J. O'Neill, Chief District Judge, Presiding

Argued and Submitted November 17, 2017
San Francisco, California

May 8, 2019

Before: Edward Leavy, William A. Fletcher,
and Richard A. Paez, Circuit Judges.

Opinion by Judge Paez;
Dissent by Judge Leavy

# SUMMARY[*]

## Constitutional Law / Takings / Seizure

The panel affirmed the district court's dismissal of an appeal by Growers seeking declaratory and injunctive relief against members of the California Agricultural Labor Relations Board who promulgated a regulation allowing union organizers access to agricultural employees at employer worksites under specific circumstances.

The Growers alleged that the access regulation, as applied to them, was unconstitutional because it was a per se taking in violation of the Fifth Amendment and was an unlawful seizure of their property in violation of the Fourth Amendment.

The panel rejected the Growers' allegation that the access regulation, as applied to them, effected a Fifth Amendment taking by creating an easement that allowed union organizers to enter their property "without consent or compensation." The panel held that the Growers did not suffer a permanent physical invasion that would constitute a per se taking. Although the access regulation did not have a contemplated end-date, it did not meet *Nollan v. California Coastal Commission*, 483 U.S. 825 (1987)'s definition of a permanent physical occupation where the regulation significantly limited organizers' access to the Growers' property. The panel further held that the Growers did not suffer a permanent physical invasion that would constitute a

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

per se taking because the sole property right affected by the regulation was the right to exclude.

The panel held that the Growers did not plausibly allege that the access regulation effected a "seizure" within the meaning of the Fourth Amendment. Specifically, the panel held that the Growers failed to cite any directly applicable authority supporting their contention that the access regulation was a meaningful interference with their possessory interests in their property. The panel further held that the Growers did not allege facts showing that the character of their property was somehow "profoundly different" because of the access regulation.

Judge Leavy dissented because he would hold that the alleged access regulation was an unconstitutional taking, and the district court erred in granting the motion to dismiss. Judge Leavy wrote that the Growers sufficiently alleged that no employees lived on the Growers' properties and the employees were not beyond the reach of the union's message; and he had found no Supreme Court case holding that non-employee labor organizers may enter an employer's nonpublic, private property for substantial periods of time, when none of the employees lived on the employer's premises.

## COUNSEL

Wencong Fa (argued), Jeremy Talcott, Joshua P. Thompson, and Damien M. Schiff, Pacific Legal Foundation, Sacramento, California; Ian B. Wieland and Howard A. Sagaser, Sagaser, Watkins & Wieland PC; Fresno, California, for Plaintiffs-Appellants.

R. Matthew Wise (argued), Deputy Attorney General; Mark R. Beckington, Supervising Deputy Attorney General; Douglass J. Woods, Senior Assistant Attorney General; Xavier Becerra, Attorney General; Office of the Attorney General, Sacramento, California; for Defendants-Appellees.

Frank Garrison and Ilya Shapiro, Cato Institute, Washington, D.C., for Amicus Curiae Cato Institute.

Gina Cannon and Steven J. Lechner, Mountain States Legal Foundation, Lakewood, Colorado, for Amicus Curiae Mountain States Legal Foundation.

Nancy N. McDonough and Carl G. Borden, California Farm Bureau Federation, for Amicus Curiae California Farm Bureau Federation.

Mario Martínez, Martínez Aguilasocho & Lynch APLC, Bakersfield, California; Jacob C. Goldberg and Henry M. Willis, Schwartz Steinsapir Dohrmann & Sommers LLP, Los Angeles, California; for Amici Curiae United Farm Workers of America and United Food and Commercial Workers Union, Local 770.

**OPINION**

PAEZ, Circuit Judge:

In 1975, the California legislature enacted the Agricultural Labor Relations Act ("ALRA") to "ensure peace in the agricultural fields by guaranteeing justice for all agricultural workers and stability in labor relations."[1] Among the ALRA's enactments was the creation of the Agricultural Labor Relations Board ("the Board"). Shortly after the ALRA's effective date, the Board promulgated a regulation allowing union organizers access to agricultural employees at employer worksites under specific circumstances. In this case, we are asked to decide whether the access regulation is unconstitutional as applied to Plaintiffs, Cedar Point Nursery and Fowler Packing Company (collectively, "the Growers").

The Growers appeal the district court's dismissal of their complaint seeking declaratory and injunctive relief against members of the Board. The Growers contend that the access regulation, as applied to them, is unconstitutional in two ways. First, the Growers allege that the regulation amounts to a per se taking in violation of the Fifth Amendment because it is a permanent physical invasion of their property without just compensation. Second, the Growers allege that the regulation effects an unlawful seizure of their property in violation of the Fourth Amendment. We conclude the access regulation does not violate either provision, and affirm.

---

[1] Cal. Lab. Code § 1140 note (West 2011) (Historical and Statutory Notes).

**BACKGROUND**

*The Access Regulation*

The ALRA authorized the Board to make "such rules and regulations as may be necessary to carry out" the ALRA. Cal. Lab. Code §§ 1141, 1144.  Pursuant to this authority, the Board promulgated an emergency regulation shortly after the ALRA's effective date that allowed union organizers access to employees on their employer's property under limited circumstances.  The Board later certified that it had subjected the regulation to notice and comment, allowing the regulation to remain in effect until repealed or amended.[2]  *Agric. Labor Relations Bd. v. Superior Court (Pandol & Sons)*, 546 P.2d 687, 692 n.3 (Cal. 1976).

The access regulation was promulgated in recognition that

> [t]he United States Supreme Court has found that organizational rights are not viable in a vacuum.  Their effectiveness depends in some measure on the ability of employees to learn the advantages and disadvantages of organization from others.  When alternative channels of effective communication are not available to a union, organizational rights must include a limited right to approach

---

[2] As the California Supreme Court explained, "The regulation took effect on August 29, 1975.  An emergency regulation automatically expire[d] 120 days after its effective date unless the agency certifie[d] during that period that it has complied with certain requirements of notice and hearing."  *Pandol & Sons*, 546 P.2d at 692 n.3 (internal citation omitted).  The Board certified that it had completed these requirements on December 2, 1975.  *Id.*

employees on the property of the employer. Under such circumstances, both statutory and constitutional principles require that a reasonable and just accommodation be made between the right of unions to access and the legitimate property and business interests of the employer . . . . Generally, unions seeking to organize agricultural employees do not have available alternative channels of effective communication. Alternative channels of effective communication which have been found adequate in industrial settings do not exist or are insufficient in the context of agricultural labor.

Cal. Code Regs. tit. 8, § 20900(b)–(c).

Thus, the Board determined that adopting a universally applicable rule for access—as opposed to case-by-case adjudications or the "adoption of an overly general rule"—would best serve the "legislatively declared purpose of bringing certainty and a sense of fair play to a presently unstable and potentially volatile condition in the agricultural fields of California." Cal. Code Regs. tit. 8, § 20900(d). The access regulation was intended to "provide clarity and predictability to all parties." *Id.*

In furtherance of these goals, the access regulation declared that the enumerated rights of agricultural employees under the ALRA include "the right of access by union organizers to the premises of an agricultural employer for the purpose of meeting and talking with employees and soliciting their support." Cal. Code Regs. tit. 8, § 20900(e). This right of access is not unlimited. Rather, the access regulation imposes a number of restrictions on access

relating to time, place, number of organizers, purpose, and conduct. *Id.* These restrictions include, among others:

> [A]n agricultural employer's property shall be available to any one labor organization for no more than four (4) thirty-day periods in any calendar year. § 20900(e)(1)(A).

> Each thirty-day period shall commence when the labor organization files in the appropriate regional office two (2) copies of a written notice of intention to take access onto the described property of an agricultural employer, together with proof of service of a copy of the written notice upon the employer . . . . § 20900(e)(1)(B).

> Organizers may enter the property of an employer for a total period of one hour before the start of work and one hour after the completion of work to meet and talk with employees in areas in which employees congregate before and after working. § 20900(e)(3)(A).

> In addition, organizers may enter the employer's property for a single period not to exceed one hour during the working day for the purpose of meeting and talking with employees during their lunch period, at such location or locations as the employees eat their lunch. § 20900(e)(3)(B).

> Any organizer who violates the provisions of this part may be barred from exercising the

> right of access . . . for an appropriate period of time to be determined by the Board after due notice and hearing. Any labor organization or division thereof whose organizers repeatedly violate the provisions of this part may be barred from exercising the right of access . . . for an appropriate period of time to be determined by the Board after due notice and hearing. § 20900(e)(5)(A).

Shortly after the Board promulgated the access regulation, several agricultural employers challenged the regulation in California state courts on both constitutional and statutory grounds. *Pandol & Sons*, 546 P.2d at 692. Ultimately, the California Supreme Court, in a 4–3 decision, vacated several different trial courts' orders enjoining enforcement of the regulation. *Id.* at 690. The *Pandol & Sons* court rejected the statutory claims by holding that the regulation was a permissible exercise of the Board's statutory authority under the ALRA and that to the extent the access regulation conflicted with the general criminal trespass statute, the access regulation prevailed. *Id.* at 699–06. The court likewise rejected the plaintiffs' constitutional claims: first, that the regulation violated their due process rights, and second, that it constituted a taking without just compensation. *Id.* at 693–699. The regulation has remained in force to the present.

## *The Growers*

Plaintiff Cedar Point is an Oregon corporation with a nursery located in Dorris, California. It raises strawberry plants for producers. Cedar Point employs approximately 100 full-time workers and more than 400 seasonal workers at its Dorris nursery. None of its employees lives on the

nursery property. Its seasonal employees are housed in hotels in Klamath Falls, Oregon.[3]

Cedar Point alleges that on October 29, 2015, organizers from the United Farm Workers union ("the UFW") entered its property at approximately 5 a.m., without providing prior written notice of intent to take access as required by the regulation. At around 6 a.m., the UFW organizers moved to the nursery's trim sheds, where they allegedly "disrupted work by moving through the trim sheds with bullhorns, distracting and intimidating workers." The majority of workers in the trim sheds did not leave their work stations during this time, although some workers joined the UFW organizers in protest. Most of the workers who had left their stations during the protest returned to work by October 31, two days after the UFW organizers entered the property. Sometime after the UFW organizers had accessed the property, they served Cedar Point with written notice of intent to take access. Following this event, Cedar Point filed a charge against the UFW with the Board, alleging that the UFW had violated the access regulation by failing to provide the required written notice prior to taking access. The UFW likewise filed a charge against Cedar Point, alleging that Cedar Point had committed an unfair labor practice. Cedar Point alleges that "it is likely that [UFW] will attempt to take access again in the near future," and that it would "exercise its right to exclude the [UFW] trespassers from its property" if not for the regulation.

Plaintiff Fowler is a large-scale shipper of table grapes and citrus, and is a California corporation headquartered in Fresno. Fowler employs 1,800 to 2,500 people in its field

---

[3] There are no allegations in the complaint regarding where Cedar Point's full-time workers live.

operations and approximately 500 people at its Fresno packing facility. Fowler's employees do not live on the premises; Fowler alleges in the complaint that its employees are "fully accessible to the Union when they are not at work." The UFW filed an unfair labor practice charge with the Board against Fowler, alleging that Fowler blocked its organizers from taking access permitted by the access regulation on three days in July 2015. The UFW subsequently withdrew the charge in January 2016. Fowler alleges that if it were not for the access regulation, it would oppose union access and "exercise its right to exclude union trespassers from its property."

*Procedural History*

In February 2016, the Growers filed a complaint for declaratory and injunctive relief under 42 U.S.C. § 1983 against several members of the Board and the Board's Executive Secretary, all of whom were sued in their official capacities.[4] The Growers alleged that the access regulation, as applied to them, amounts to a taking in violation of the Fifth Amendment and that it effects an unlawful seizure of their property in violation of the Fourth Amendment. They sought declaratory and injunctive relief, barring the Board from enforcing the regulation against them. Upon filing the complaint, the Growers filed a motion for a preliminary injunction to bar enforcement of the regulation against them. The Board opposed the motion and promptly moved to

---

[4] As all Defendants were sued in their official capacities, we refer to them collectively as "the Board" throughout this opinion. The Growers' suit, which seeks only prospective, declaratory, and injunctive relief, is not barred by the Eleventh Amendment. *See Ex parte Young*, 209 U.S. 123 (1908); *see also Seven Up Pete Venture v. Schweitzer*, 523 F.3d 948, 956 (9th Cir. 2008).

dismiss the Growers' complaint under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim.

After denying the Growers' motion for injunctive relief as to both the Fifth and Fourth Amendment claims, the district court granted the Board's motion to dismiss. The district court rejected the Growers' argument that the regulation constitutes a per se categorical taking, either on its face or as applied to them.[5] As to the Fourth Amendment claim, the district court held that the Growers had not plausibly alleged that the regulation "has been or will be enforced against them in a manner that will cause a meaningful interference with their possessory interests" such that it would effect a seizure within the meaning of the Fourth Amendment.[6] The district court granted the Growers leave to amend. The Growers declined to amend the complaint, and the district court entered judgment in favor of the Board in July, 2016. The Growers timely appealed.

## STANDARD OF REVIEW

We review de novo a district court's order granting a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6). *Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540

---

[5] Takings claims are not ripe in federal court "until the government entity charged with implementing the regulations has reached a final decision regarding the application of the regulations to the property at issue" and the state has denied the plaintiff any opportunity for just compensation. *Williamson Cty. Reg'l Planning Comm'n v. Hamilton Bank of Johnson City*, 473 U.S. 172, 186, 195 (1985). Although the Board does not challenge ripeness on appeal, we agree with the district court that the Growers' takings claim is ripe for consideration.

[6] Because the Growers did not meet their burden as to the "threshold issue" of plausibly alleging a seizure, the district court did not discuss reasonableness in its order dismissing the case.

F.3d 1049, 1061 (9th Cir. 2008). In evaluating a motion to dismiss under Rule 12(b)(6), "[r]eview is limited to the complaint, materials incorporated into the complaint by reference, and matters of which the court may take judicial notice." *Id.* (citing *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007)).

We may affirm a 12(b)(6) dismissal "on any ground supported by the record, even if the district court did not rely on the ground." *Livid Holdings, Ltd. v. Salomon Smith Barney, Inc.*, 416 F.3d 940, 950 (9th Cir. 2005). In evaluating a 12(b)(6) motion, we accept "as true all well-pleaded allegations of fact in the complaint" and construe them in the light most favorable to the non-moving party. *United States v. Corinthian Colls.*, 655 F.3d 984, 991 (9th Cir. 2011). To survive a motion to dismiss, the complaint "must contain sufficient factual matter" that, taken as true, states "a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

## DISCUSSION

The Growers argue that the access regulation as applied to them amounts to a per se taking in violation of the Fifth Amendment and effects an unlawful seizure of their property in violation of the Fourth Amendment.

## I. Fifth Amendment Per Se Takings Claim

We turn first to the Growers taking claim. We agree with the district court that the allegations in the complaint, taken as true, are insufficient to state a plausible claim for relief as a per se taking under the Fifth Amendment's Takings Clause.

The Fifth Amendment's Takings Clause "provides that private property shall not 'be taken for public use, without just compensation.'" *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 536 (2005). The Supreme Court has recognized three categories of regulatory action in its takings jurisprudence, each of which "aims to identify regulatory actions that are functionally equivalent to the classic taking in which government directly appropriates private property or ousts the owner from his domain" and which focus a court's inquiry "directly upon the severity of the burden that government imposes upon private property rights." *Id.* at 539.

The first category is "where government requires an owner to suffer a permanent physical invasion of her property—however minor." *Id.* at 538 (citing *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419 (1982)). The second category involves regulations that "completely deprive an owner of '*all* economically beneficial us[e]' of her property." *Id.* (emphasis in original) (quoting *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1019 (1992)). These first two categories involve actions that "generally will be deemed [per se] takings for Fifth Amendment purposes," but both categories are "relatively narrow." *Id.* The third category covers the remainder of regulatory actions, which are governed by the standards set forth in *Penn Central Transportation Co. v. New York City*, 438 U.S. 104, 124 (1978). *Id.*

Here, the Growers allege that the access regulation, as applied to them, effects a Fifth Amendment taking by creating an easement that allows union organizers to enter their property "without consent or compensation." The Growers base their Fifth Amendment argument entirely on the theory that the access regulation constitutes a permanent

physical invasion of their property and therefore is a per se taking.

In *Loretto*, the Supreme Court held that a state law requiring landlords to allow installation of cable facilities by cable television companies on their property constituted a per se taking because the installation was a permanent, albeit minor, physical occupation of the property. 458 U.S. at 421–423, 441. The Court noted the "constitutional distinction between a permanent occupation and a temporary physical invasion." *Id.* at 434. The Growers argue that, under *Loretto*, the access regulation is a permanent physical occupation, as opposed to a temporary invasion. The Growers contend that the concept of permanence, as contemplated in *Loretto*, "does not require the physical invasion to be continuous, but instead that it have no contemplated end-date."

This argument is contradicted by the Court's opinions in *PruneYard Shopping Center v. Robins*, 447 U.S. 74 (1980) and *Nollan v. California Coastal Commission*, 483 U.S. 825 (1987). In *PruneYard*, the Supreme Court considered whether the California Supreme Court's decision in *Robins v. Pruneyard Shopping Center*, 592 P.2d 341 (Cal. 1979), violated the Takings Clause. 447 U.S. at 76–77. In that case, the California Supreme Court held that the California Constitution protects reasonably exercised speech and petitioning in privately owned shopping centers. *Robins*, 592 P.2d at 347. The PruneYard, a privately owned shopping center that was open to the public for purposes of patronizing its commercial establishments, had a policy of forbidding visitors and tenants from engaging in public expressive activity unrelated to commercial purposes. *PruneYard*, 447 U.S. at 77.

Although the dissent correctly points out that *PruneYard* involved free speech, it also addressed a taking claim under the Fifth Amendment. Dissent at 25. As relevant here, the Court recognized that the California Supreme Court's decision "literally" constituted a "taking" of PruneYard's right to exclude others, but noted, "not every destruction or injury to property by governmental action has been held to be a 'taking' in the constitutional sense." *PruneYard*, 447 U.S. at 82 (citing *Armstrong v. United States*, 364 U.S. 40, 48 (1960)). The Court concluded that requiring the PruneYard to "permit appellees to exercise state-protected rights of free expression and petition on shopping center property clearly does not amount to an unconstitutional infringement of [the PruneYard's] property rights under the Taking Clause." *Id.* at 83.

Thus, in *PruneYard* there was no "contemplated end-date" to the California Supreme Court's decision holding that the California Constitution protects reasonably exercised speech and petitioning in privately owned shopping centers. Yet, contrary to the Growers' argument, the Court did not conclude that the California Supreme Court's decision resulted in a permanent physical invasion. *Id.* at 83–84.

Similarly, *Nollan* does not support the Growers' theory. There, the Court considered whether the California Coastal Commission could condition the grant of a permit to rebuild a house on a transfer to the public of an easement across beachfront property. *Nollan*, 483 U.S. at 827. The Court held that California could use its power of eminent domain for this "public purpose," but if it wanted an easement, it must pay for it. *Id.* at 841–42. In its analysis, the Court concluded that a permanent physical occupation occurs "where individuals are given a permanent and continuous

right to pass to and fro, so that the real property may continuously be traversed, even though no particular individual is permitted to station himself permanently upon the premises." *Id.* at 832. It noted that that the *PruneYard* holding was not inconsistent with this analysis, "since there the owner had already opened his property to the general public, and in addition permanent access was not required." *Id.* at 832 n.1.

Although the access regulation does not have a "contemplated end-date," it does not meet *Nollan's* definition of a permanent physical occupation. As structured, the regulation does not grant union organizers a "permanent and continuous right to pass to and fro" such that the Growers' property "may continuously be traversed." *Id.* at 832. The regulation significantly limits organizers' access to the Growers' property. Unlike in *Nollan*, it does not allow random members of the public to unpredictably traverse their property 24 hours a day, 365 days a year.

Furthermore, the Growers have not suffered a permanent physical invasion that would constitute a per se taking because the sole property right affected by the regulation is the right to exclude. "[I]t is true that one of the essential sticks in the bundle of property rights is the right to exclude others." *PruneYard*, 447 U.S. at 82 (internal citation omitted). In a permanent physical invasion, however, "the government does not simply take a single 'strand' from the 'bundle' of property rights: it chops through the bundle, taking a slice of every strand." *Loretto*, 458 U.S. at 435; *accord Murr v. Wisconsin*, 137 S. Ct. 1933, 1952 (2017) ("[W]here an owner possesses a full 'bundle' of property rights, the destruction of one strand of the bundle is not a taking, because the aggregate must be viewed in its entirety.") (Roberts, C.J., dissenting) (quoting *Andrus v.*

*Allard*, 444 U.S. 51, 65–66 (1979)). The Growers do not allege that other property rights are affected by the access regulation. This undermines their contention that the access regulation effects a taking because they only allege that the regulation affects "one strand of the bundle" of property rights. *Cf. Dolan v. City of Tigard*, 512 U.S. 374, 394 (1994) (noting that unlike in *PruneYard*, a permanent recreational easement would not merely "regulate" plaintiff's right to exclude, but rather would "eviscerate" it, as she "would lose all rights to regulate the time in which the public entered onto the [property], regardless of any interference it might pose with her retail store").

The above discussion leads us to conclude that the access regulation is not a permanent physical taking. We do note, however, that in *PruneYard*, the Court analyzed the restriction under the standards set forth in *Penn Central Transportation Co. v. New York City*, rather than analyzing it as a permanent physical invasion.[7] *PruneYard*, 447 U.S. at 83–84. In its analysis, the Court noted there was "nothing to suggest" that the restriction would "unreasonably impair the value or use of [the] property as a shopping center" and that the PruneYard was "a large commercial complex . . . [that was] open to the public at large." *Id.*

The Growers attempt to distinguish their case from *PruneYard* by overstating the extent to which the Supreme

---

[7] In *Penn Central*, the Supreme Court observed that an "ad hoc" factual inquiry was required to determine whether a regulatory action required compensation under the Fifth Amendment. 438 U.S. at 124. The Court identified "several factors that have particular significance," including the economic impact of the regulation, its interference with reasonable investment-backed expectations, and the character of the government action. *Id.*; *see also Horne v. Dep't of Agric.*, 135 S. Ct. 2419, 2427 (2015).

Court relied on the fact that the PruneYard was a shopping center generally open to the public.  While that was a consideration for the Court, it was not a dispositive one—and critically, it only factored into the Court's analysis under the standards set forth in *Penn Central*.  *Id.* at 82–83.

*PruneYard*'s use of the *Penn Central* analysis further weighs against the Growers' contention that the access regulation is a permanent physical taking.  In many ways, the access restriction is analogous to the restriction at issue in *PruneYard*, which required the shopping center to permit individuals to exercise free speech rights on its property. *PruneYard*, 447 U.S. at 76–77.  The Court's analysis of this restriction under *Penn Central* counsels against analyzing the access regulation as a permanent per se taking.[8]

Furthermore, the question of whether the access regulation falls under the category of takings governed by *Penn Central* is not before this court.  At no point in this litigation have the Growers challenged the regulation under *Penn Central*.  Their complaint alleges that the access regulation causes an unconstitutional taking because it "creates an easement for union organizers to enter [the Growers'] private property without consent or compensation."  Before the district court, the Growers argued that the access regulation should be treated as a per

---

[8] The Court also contrasted the PruneYard shopping center's situation with that of the plaintiffs in *Kaiser Aetna v. United States*, 444 U.S. 164 (1979).  *See PruneYard*, 447 U.S. at 84.  *Kaiser Aetna* also weighs against the Growers' theory that the access regulation is a permanent physical taking.  There, the Court held that requiring owners of a public pond to allow free public use of its marina constituted a taking—but only after applying the *Penn Central* analysis, rather than the permanent physical invasion analysis.  *Kaiser Aetna*, 444 U.S. at 178–180.

se taking because the Growers must surrender their right to exclude trespassers permanently. And before this court, they argued in their opening brief that the access regulation involved a physical invasion, as opposed to a regulatory taking. Therefore, we take no position regarding whether the access regulation falls under the category of takings governed by the standards set forth in *Penn Central*.

The dissent contends that our analysis should be guided by *NLRB v. Babcock & Wilcox*, 351 U.S. 105 (1956), and its progeny.[9] Dissent at 26–27. *Babcock*, however, pertained to an alleged violation of section 7 of the National Labor Relations Act ("NLRA"). *Nat'l Labor Relations Bd. v. Babcock & Wilcox Co.*, 351 U.S. 105, 106 (1956); *see also Lechmere, Inc. v. N.L.R.B.*, 502 U.S. 527, 529 (1992) ("This case requires us to clarify the relationship between the rights of employees under § 7 of the National Labor Relations Act (NLRA or Act) . . . and the property rights of their employers."); *Hudgens v. N. L. R. B.*, 424 U.S. 507, 508 (1976) ("The question presented is whether this threat

---

[9] The dissent points out that the California Supreme Court looked to *Babcock* for guidance when first analyzing the access regulation in *Pandol & Sons*. Dissent at 26. There, the court also pointed out that the Board determined that "significant differences existed between the working conditions of industry in general and those of California agriculture." *Pandol & Sons*, 546 P.2d at 702. The court highlighted some of those differences including that "many farmworkers are migrants," "the same employees did not arrive and depart every day on fixed schedules, there were no adjacent public areas where the employees congregated or through which they regularly passed, and the employees could not effectively be reached at permanent addresses or telephone numbers in the nearby community, or by media advertising." *Id.* The record is silent on whether the Board has revisited these differences. In any event, we do not need to address them because the only issue before us is whether the access regulation is a per se physical taking.

violated the National Labor Relations Act."). The NLRA does not apply to "any individual employed as an agricultural laborer." 29 U.S.C. § 152(3). And while *Babcock* may be helpful in analyzing challenges to the access regulation under the ALRA, it is not relevant to the Growers' contention that the access regulation is a physical per se taking in violation of the Fifth Amendment.

In conclusion, we hold that the access regulation as applied to the Growers does not amount to a per se physical taking of their property in violation of the Fifth Amendment. Having been granted the opportunity to amend their complaint and having declined to do so, the district court did not err in dismissing the Growers' takings claim.

## II. Fourth Amendment Seizure Claim

The first clause of the Fourth Amendment provides that the "right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV. To establish a seizure claim under the Fourth Amendment, the Growers must plausibly allege that a seizure occurred and that it was unreasonable. *See Soldal v. Cook County, Ill.*, 506 U.S. 56, 61–62 (1992). We agree with the district court's conclusion that the Growers failed to allege a plausible claim that the access regulation, as applied to them, effects a seizure protected by the Fourth Amendment.

A "'seizure' of property occurs when there is some meaningful interference with an individual's possessory interests in that property." *United States v. Jacobsen*, 466 U.S. 109, 113 n.5 (1984). First, the Growers argue the access regulation effects a seizure because it substantially interferes with their right to exclude. They contend that the access regulation authorizes a "technical trespass."

The majority's holding in *United States v. Karo* undercuts the Growers' Fourth Amendment seizure argument. 468 U.S. 705, 712–13 (1984). There, the Court considered, *inter alia*, whether the transfer of a container by federal agents containing an unknown and unwanted beeper constituted a seizure. *Id.* at 712. First, the Court held that "[t]he existence of a physical trespass is only marginally relevant to the question of whether the Fourth Amendment has been violated . . . for an actual trespass is neither necessary nor sufficient to establish a constitutional violation." *Id.* at 712–13. The Court then concluded that the mere transfer of the container with an unmonitored beeper did not constitute a seizure because it did not interfere with anyone's possessory interest in a meaningful way. *Id.* at 712. The Court noted that "[a]t most, there was a technical trespass on the space occupied by the beeper," but "if the presence of a beeper in the can constituted a seizure merely because of its occupation of space, it would follow that the presence of any object, regardless of its nature, would violate the Fourth Amendment." *Id.* at 712–13.[10]

More importantly, the Growers fail to cite any directly applicable authority supporting their contention that the access regulation is a meaningful interference with their possessory interests in their property. The Growers rely on *Presley v. City of Charlottesville*, 464 F.3d 480 (4th Cir.

---

[10] The Growers attempt to distinguish their case from *Karo* by pointing out that federal agents placed the beeper with the consent of the original owner before possession was transferred. They argue that that they did not consent to the entry of the union organizers onto their property. Yet, the original owner's consent was relevant to the *Karo* Court's analysis of whether "the actual placement of the beeper into the can" violated the defendant's Fourth Amendment rights, but did not factor into the Court's analysis of whether the transfer of the can to Karo was a seizure. *Karo*, 468 U.S. at 711–13.

2006), to support their argument.  There, the Fourth Circuit concluded that the alleged "constant physical occupation" constituted a "'meaningful interference' with [the plaintiff's] 'possessory interests' in her property." *Id.* at 487 (citing *Jacobsen*, 466 U.S. at 113).  The case concerned a trail map published by the city of Charlottesville that mistakenly showed a trail crossing through Presley's property (which encompassed less than an acre of land).  *Id.* at 482.  City officials refused to correct the error when Presley repeatedly complained, and declined to offer her compensation in exchange for an easement.  *Id.* at 482–83. Presley had posted over 100 "No Trespassing" signs on her property, "all of which were defaced or destroyed."  *Id.* at 483.  Although Presley contacted the police to help stop trespassers, the police "could not stem the tide."  *Id.*  When Presley installed razor wire on her property in an attempt to block the trespassers, the city enacted an ordinance to prohibit her from pursuing such protective measures, and initiated a criminal prosecution (later dismissed) against her for violation of the ordinance.  *Id.*

The factual circumstances in *Presley* make it inapposite to the access regulation as applied to the Growers.  As the Fourth Circuit noted, Presley alleged that she had been "deprived of the use of her property due to the regular presence of a veritable army of trespassers who freely and regularly traverse her yard, littering, making noise, damaging her land, and occasionally even camping overnight."  *Id.* at 487.  Here, the Growers do not make such allegations.  They do not allege that the access regulation authorizes an intrusion that is constant, uncontrollable (even with police assistance), unpredictable, damaging, and stressful.  The access regulation only allows controlled, non-disruptive visits that are limited in time, place, and number of union organizers.

Second, the Growers argue that the access regulation effects a seizure because it profoundly changes the character of the property. They urge us to adopt the test set forth in Justice Stevens' partial concurrence in *United States v. Karo*. There, Justice Stevens argued that a meaningful interference occurs when "the character of the property is profoundly different" with the interference than without it. *Karo*, 468 U.S. at 729 (Stevens, J., concurring in part dissenting in part). Yet even assuming this were the proper test, the Growers have not alleged facts showing that the character of their property is somehow "profoundly different" because of the access regulation. At most, the regulation would allow organizers access to the Growers' property 360 hours a year out of a total 8,760 hours (and only 120 of those hours would be during the workday). The Growers argue that the access regulation "transform[s] [their] property from a forum for production into a proselytizing opportunity for union organizers," but there are no such allegations in the complaint.

We therefore hold that the Growers have not plausibly alleged that the access regulation effects a "seizure" within the meaning of the Fourth Amendment.

**AFFIRMED.**

---

LEAVY, Circuit Judge, dissenting:

I respectfully dissent. In my view, the complaint sufficiently alleges that the Agricultural Labor Relations Board's Access Regulation is an unconstitutional taking, so the district court erred in granting the motion to dismiss. The Growers allege that no employees reside on the employers property, and that alternative methods of effective

communication are available to the nonemployee union organizers who, under the Access Regulation, are allowed to physically enter the Growers' properties for substantial time periods. Specifically, I have found no Supreme Court case holding that non-employee labor organizers may enter an employer's nonpublic, private property for substantial periods of time, when none of the employees live on the employer's premises.

In spite of the majority's reliance on *PruneYard Shipping Center. v. Robins*, 447 U.S. 74 (1980), this is not a free speech case.[1] Instead, this case involves labor relations and the government's policy of encouraging collective bargaining. Thus, *PruneYard* provides little guidance.[2]

---

[1] The issue in *PruneYard* was whether the California constitution, which allows individuals to exercise First Amendment rights on private shopping center property, violated the federal constitution. The issue involved "only a state-created right of limited access to a specialized type of property." *Id.* at 98 (Powell, concurring). The PruneYard "specialized property" was a multi-block shopping center, open to the public to "come and go as they please," *id.* at 87, where "25,000 persons are induced to congregate daily." *Id.* at 78 (quoting *Robins v. PruneYard Shopping Ctr.*, 23 Cal. 3d 899, 910–911 (1979)). By contrast, in this case, the Growers are private employers with employees entering their properties daily for the sole purpose of agricultural work, with no public access.

[2] The property owner in *PruneYard* wields the power to impose time, place, and manner restrictions on the general public's free expression rights on its premises. In the case at bar, a California agency imposes its power to regulate time, place, and manner restrictions on the Growers' right to exclude nonemployees. In other words, *PruneYard* involves a private party regulating the expressive conduct of other private parties entering its property where the public is invited. Our case involves a state agency universally regulating the access of nonemployee organizers on non-public, private property.

The California Legislature directs the Agricultural Labor Relations Board to "follow applicable precedents of the National Labor Relations Act." Cal. Labor Code § 1148. The outcome of this case is guided by cases concerning the rights of nonemployees to physically access the employer's property in order to communicate with employees about union organization. Although the NLRA's enforcement authority does not apply to "any individual employed as an agricultural laborer." 29 U.S.C. § 152(3), there is no dispute in this case about the agricultural status of the employee laborers. Rather, the dispute raised in the Grower's complaint is the constitutionality of the Board's regulation requiring employers to grant substantial physical access to nonemployee organizers where the agricultural employees do not reside on the employers' private property and are not beyond the reach of the organizers' message.

The California Supreme Court, when first analyzing the Access Regulation in *Pandol & Sons*, 546 P.2d 692 (Cal. 1976), correctly framed the issue: "The matter at bar, by contrast, is not primarily a First Amendment case . . . ; rather, the interest asserted is the right of *workers employed on the premises in question to have effective access to information* assisting them to organize into representative units pursuant to a specific governmental policy of encouraging collective bargaining." *Id.* at 694 (emphasis added). The *Pandol* court looked for guidance to *NLRB v. Babcock & Wilcox*, 351 U.S. 105 (1956), "[W]hen the inaccessibility of employees makes ineffective the reasonable attempts by nonemployees to communicate with them through the usual channels, the right to exclude from property has been required to yield to the extent needed to permit communication of information on the right to organize." *Pandol*, 546 P.2d at 406 (*quoting Babcock*, 351 U.S. at 112).

The *Pandol* court upheld the regulation under the California constitution, comparing the inaccessibility of workers in California's agricultural industry to federal labor cases involving inaccessibility of workers in mining camps, lumber camps, and rural resort hotels. *Id.* at 406–408. The *Pandol* court summarized the rule of *Babcock*: "[I]f the circumstances of employment place the employees *beyond the reach of reasonable union efforts to communicate with them*, the employer must allow the union to approach his employees on his property." *Id.* at 409 (*quoting Babcock*, 351 U.S. at 113) (emphasis added). The *Babcock* rule has not been abrogated. *See Lechmere v. NLRB*, 502 U.S. 527, 540–41 (1992) (reaffirming *Babcock*); *Hudgens v. NLRB*, 424 U.S. 507, 521–22 (1976) (approving *Babcock's* admonition that accommodation between employees' labor rights and employers' property rights "must be obtained with as little destruction of one as is consistent with the maintenance of the other"); *Central Hardware Co. v. NLRB*, 407 U.S. 539, 545 (1972) (explaining that under *Babcock*, nonemployee organizers cannot claim a limited right of access to a nonconsenting employer's property until after the requisite need for access to the property has been shown); *ITT Industries, Inc. v. N.L.R.B.*, 251 F.3d 995, 999 (D.C. Cir. 2001) ("For nearly fifty years, it has been black-letter labor law that the Board cannot order employers to grant nonemployee union organizers access to company property absent a showing that on-site employees are otherwise inaccessible through reasonable efforts.").

In my view, the Access Regulation allowing ongoing access to Growers' private properties, multiple times a day for 120 days a year (four 30-day periods per year) is a physical, not regulatory, occupation because the "right to exclude" is "one of the most fundamental sticks" in the bundle of property rights. *Dolan v. City of Tigard*, 512 U.S.

374, 394 (1994); *Kaiser Aetna v. United States*, 444 U.S. 164, 179–80 (1979) (stating that the right to exclude others is one of the "essential sticks" in the bundle of property rights). The Growers need not allege that the Access Regulation affects more property right "sticks" beyond this single, fundamental property right.[3]

The complaint alleges that the Access Regulation is unconstitutional because the Growers' employees, none of whom live on the Growers' premises, are not beyond the reach of union efforts. The complaint alleges employees can be reached by union organizers at nearby, off-premises locations through alternative means of communication. Complaint, Par. 27 ("Seasonal workers at Cedar Point are housed in hotels in nearby Klamath Falls, Oregon. None of Cedar Point's full-time or seasonal employees live on the Nursery's property."); Complaint, Par. 37 ("Fowler's employees do not live on the premises and are fully accessible to the Union when they are not at work."); Complaint Par. 64 ("And because such access is unnecessary given the alternative means of communication available, *see Lechmere v. NLRB*, 502 U.S. 527, 540–41 (1992), it is unreasonable to allow union organizers to seize this possessory interest in Plaintiff's property.").

The Supreme Court in *Lechmere* expressly reaffirmed *Babcock's* critical distinction between employees and nonemployees regarding union activities on private property. *Id.* at 537. The Court also reaffirmed *Babcock's* general rule that "an employer may validly post his property against nonemployee distribution of union literature," and rejected an initial balancing test. The Court stated that the

---

[3] The majority fails to cite any cases dealing with the property rights of employers as opposed to access rights by nonemployees.

threshold inquiry is whether the facts in a case justify application of *Babcock*'s inaccessibility exception. *Id.* at 538–39. The Court explained, "[T]he exception to Babcock's rule is a narrow one. It does not apply wherever nontrespassory access to employee may be cumbersome or less-than-ideally effective, but only where 'the *location of a plant and the living quarters of the employees place the employees beyond the reach* of reasonable union efforts to communicate with them." *Id.* at 539 (quoting *Babcock*, 351 U.S. at 113 (original emphasis)). The Court concluded, "[B]ecause the employees do not reside on Lechmere's property, they are presumptively not 'beyond the reach' of the union's message." *Id.* at 540 (internal citation omitted). Here, in light of the Growers' allegations, the burden should shift to the defendants to show "unique obstacles" that frustrate their reasonable access to the Growers' employees. *See id.* at 540–41.

In summary, because the Growers sufficiently allege that no employees live on the Growers' properties and the employees are not beyond the reach of the union's message, the district court erred in dismissing the complaint.