**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

CEDAR POINT NURSERY; FOWLER
PACKING COMPANY, INC.,
*Plaintiffs-Appellants*,

v.

GENEVIEVE SHIROMA; CATHRYN
RIVERA-HERNANDEZ; SANTIAGO
AVILA-GOMEZ, Esquire; ISADORE
HALL III,
*Defendants-Appellees.*

No. 16-16321

D.C. No.
1:16-cv-00185-
LJO-BAM

ORDER

Filed April 29, 2020

Before: Edward Leavy, William A. Fletcher,
and Richard A. Paez, Circuit Judges.

Order;
Concurrence by Judge Paez;
Dissent by Judge Ikuta

# SUMMARY[*]

## Civil Rights

The panel denied a petition for panel rehearing, and denied on behalf of the court a petition for rehearing en banc, from an opinion in which the panel affirmed the district court's dismissal of an action seeking declaratory and injunctive relief against members of the California Agricultural Labor Relations Board who promulgated a regulation allowing union organizers access to agricultural employees at employer worksites under specific circumstances.

Concurring in the denial of rehearing en banc, Judge Paez, joined by Judge W. Fletcher wrote separately only to respond to arguments raised in Judge Ikuta's dissent from the decision, which were not raised by the parties. Judge Paez stated that the majority opinion correctly held that the plaintiffs had not suffered a "permanent and continuous" loss of their right to exclude the public from their property. They had thus not suffered a taking in violation of the Fifth Amendment.

Dissenting from the denial of rehearing en banc, Judge Ikuta joined by Judges Callahan, R. Nelson, Bade, Collins, Bress, Bumatay, and VanDyke stated that the majority fundamentally misunderstood the nature of the property rights at issue, and how California had taken them. Judge Ikuta wrote that the plaintiffs had plausibly alleged that California had appropriated easements and thus taken

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

valuable property rights protected by the Takings Clause. By failing to give fair consideration to the plaintiffs' actual claims, the majority created a circuit split, disregarded binding Supreme Court precedent, and deprived property owners of their constitutional rights.

## COUNSEL

Wencong Fa (argued), Jeremy Talcott, Joshua P. Thompson, Damien M. Schiff, and Christopher M. Kieser, Pacific Legal Foundation, Sacramento, California; Ian B. Wieland and Howard A. Sagaser, Sagaser Watkins & Wieland PC; Fresno, California; for Plaintiffs-Appellants.

R. Matthew Wise (argued), Deputy Attorney General; Mark R. Beckington, Supervising Deputy Attorney General; Douglass J. Woods and Thomas S. Patterson, Senior Assistant Attorneys General; Xavier Becerra, Attorney General; Office of the Attorney General, Sacramento, California; for Defendants-Appellees.

Frank Garrison and Ilya Shapiro, Cato Institute, Washington, D.C., for Amicus Curiae Cato Institute.

Steven J. Lechner, Mountain States Legal Foundation, Lakewood, Colorado, for Amicus Curiae Mountain States Legal Foundation.

Nancy N. McDonough and Carl G. Borden, California Farm Bureau Federation, Sacramento, California, for Amicus Curiae California Farm Bureau Federation.

Mario Martínez, Martínez Aguilasocho & Lynch APLC, Bakersfield, California; Jacob C. Goldberg and Henry M.

Willis, Schwartz Steinsapir Dohrmann & Sommers LLP, Los Angeles, California; for Amici Curiae United Farm Workers of America and United Food and Commercial Workers Union, Local 770.

**ORDER**

The full court was advised of the petition for rehearing en banc. A judge requested a vote on whether to rehear the matter en banc. The matter failed to receive a majority of the votes of the nonrecused active judges in favor of en banc consideration. Fed R. App. P. 35.

The petition for rehearing en banc is **DENIED**.

Attached are a dissent from and a concurrence respecting the denial of rehearing en banc.

PAEZ, Circuit Judge, concurring in the denial of rehearing en banc, joined by W. FLETCHER, Circuit Judge:

A majority of the active judges of the court voted against rehearing this case en banc. I concur in that decision and write only to respond to arguments raised in Judge Ikuta's dissent from that decision, which were not raised by the parties. The dissent argues that the panel opinion failed to address the Growers' central argument that the Access Regulation appropriates an easement by granting union organizers access to their property without their approval. According to the dissent, because an easement is a species of property, the Access Regulation effects a taking of property in violation of the Fifth Amendment.

The dissent accuses the majority of ignoring the Growers' claim and reframing it as a different one. This seriously mischaracterizes the Growers' arguments before this court. They argued one and only one theory of their case: that the Access Regulation amounted to a "permanent physical invasion" of their property. They did not argue that the taking of an easement was the beginning and end of the analysis. They wisely did not do so because the argument advanced by Judge Ikuta fundamentally misapprehends existing Supreme Court authority.

\* \* \*

The dissent's central doctrinal argument is that the state engages in a Fifth Amendment taking whenever it appropriates an easement. As support for this bright-line rule, the dissent cites a series of Supreme Court cases purportedly holding that the imposition of any easement is a per se taking. The cases say no such thing.

In *Portsmouth Harbor Land and Hotel Co. v. United States*, for instance, the dissent points out that the Court remarked that a "servitude" constitutes "an appropriation of property for which compensation should be made." 260 U.S. 327, 329 (1922) (citation omitted). But what the dissent neglects to mention is that in *Portsmouth Harbor*, the Court limited its inquiry to whether the servitude imposed in that case "would constitute an appropriation of property for which compensation should be made" when the intrusion "*result[ed] in depriving the owner of its profitable use*[.]" *Id.* (citation omitted) (emphasis added).

The Court applied that same basic principle in *United States v. Causby*. There, the Court considered whether a taking had occurred where military flights in the airspace over the plaintiffs' property resulted in "the destruction of

the use of the property as a commercial chicken farm." 328 U.S. 256, 259 (1946). The government conceded—and the Court agreed—that the military flight activities would effect a taking if the "flights over respondents' property rendered it uninhabitable." *Id.* at 261. The government's actions resulted in the taking of an "easement of flight" and, "if permanent and not merely temporary, normally would be the equivalent of a fee interest." *Id.* at 261–62. The government's acts "would be a definite exercise of complete dominion and control over the surface of the land." *Id.* at 262. "If, by reason of the frequency and altitude of the flights, respondents could not use this land for any purpose, their loss would be complete. It would be as complete as if the United States had entered upon the surface of the land and taken exclusive possession of it." *Id.* at 261 (footnote omitted). Although there was a taking of an "easement of flight," a Fifth Amendment taking occurred not only because of the "easement," but because of the severe negative effects of the government's actions on the plaintiffs' property. *Id.* at 261–62.

Neither of these cases stands for the proposition that a regulatory easement which allows intermittent intrusions onto private property will result in a taking where there is no evidence that the intrusion has rendered the property "uninhabitable," *id*. at 261, or "depriv[ed] the owner of its profitable use," *Portsmouth Harbor*, 260 U.S. at 329.

The dissent faults the majority for failing to address whether the appropriation of an easement, by itself, violates the Takings Clause. The dissent complains that the majority instead erroneously focuses on whether the Access Regulation amounted to a "permanent physical invasion." As support for this accusation, the dissent notes that in their complaint, the Growers allege that "the access regulation

now creates an easement for union organizers to enter Plaintiffs' private property without consent or compensation." The dissent then asserts that the majority "ignore[d]" and "re-characteriz[ed]" the Growers' claim.

But the dissent's theory is not the theory the Growers advanced in their appellate briefs. Although the Growers did assert that the Access Regulation "appropriat[es] an easement[,]" they argued that the easement was a "permanent physical intrusion" under *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419 (1982). As a result of this intrusion, the Growers argued, the Access Regulation effected an unconstitutional taking.

Guided by the *Nollan*[1] standard—that a "permanent physical invasion" occurs when the state grants the public a "permanent and continuous right to pass to and fro, so that the real property may continuously be traversed"—the majority correctly held that the Growers failed to state a cognizable takings claim. Although the Access Regulation does not have a contemplated end-date, it does not grant union organizers a "permanent and continuous right to pass to and fro" on the Growers' property. The regulation makes clear that the union organizers may not, whenever they desire, enter the employers' premises to speak with employees about unionization. Only in specific circumstances may they take advantage of the limited access provided by the Access Regulation. Given that the Access Regulation does not authorize "continuous" access to the Growers' property, it likewise does not result in a wholesale deprivation of their right to exclude and thus does not effect a Fifth Amendment taking. And unlike the raisin farmers in *Horne v. Department of Agriculture*, who were forced to

---

[1] *Nollan v. Cal. Coastal Comm'n*, 483 U.S. 825, 832 (1987).

transfer over half of their annual crops to the federal government, the Growers here were not stripped of their "rights to possess, use and dispose of" their property.[2] 135 S. Ct. 2419, 2428 (2015) (quoting *Loretto*, 458 U.S. at 435).

The dissent also asserts that the majority opinion creates a circuit split with the Federal Circuit's decision in *Hendler v. United States*, 952 F.2d 1364 (Fed. Cir. 1991). Not so. In that case, the government installed wells on the plaintiffs' property and subsequently "entered upon [their] land from time to time, without permission, for purposes of" maintaining them. *Id.* at 1377. The court reasoned that "[t]hese surveillance wells [were] at least as 'permanent' in this sense as the CATV equipment in *Loretto*, which comprised only a few cables attached by screws and nails and a box attached by bolts." *Id.* (citation omitted). And even after installing the physical wells, the government routinely entered the plaintiffs' land "at its convenience," as if it had "acquired an easement not unlike that claimed in" *Kaiser Aetna v. United States*, 444 U.S. 164 (1979). *Hendler*, 952 F.2d at 1378. The resulting situation was a complete "taking of the plaintiffs' right to exclude," so long as the wells remained on the property. *Id.* As in *Nollan* and *Kaiser Aetna*, the property owners retained no ability to

---

**[2]** The government's raisin-seizure was a per se taking under *Loretto* because the growers "lost the entire 'bundle' of property rights in the appropriated raisins—'the rights to possess, use and dispose of' them— with the exception of the speculative hope that some residual proceeds may be left when the Government is done with the raisins and has deducted the expenses of implementing all aspects of the marketing order." *Horne*, 135 S. Ct. at 2428 (internal citation omitted). "Actual raisins [were] transferred from the growers to the Government" and "[t]itle to the raisins passe[d] to the Raisin Committee." *Id.* No such transfer happened here.

control when and where the government trespassed upon their property. *Id.*

Here, unlike in *Hendler*, the Board has not erected a permanent physical structure on the Growers' property, and the union organizers are excludable from the property unless they are authorized to enter under the terms of the Access Regulation. The court's opinion thus does not create a circuit split.

\* \* \*

The court's majority opinion correctly held that the Growers have not suffered a "permanent and continuous" loss of their right to exclude the public from their property. *Nollan*, 483 U.S. at 832. They have thus not suffered a taking in violation of the Fifth Amendment. Neither the panel majority nor the district court erred in so holding.

For the reasons discussed above and in the majority opinion, I concur in the court's decision not to rehear this case en banc.

---

IKUTA, Circuit Judge, joined by CALLAHAN, R. NELSON, BADE, COLLINS, BRESS, BUMATAY, and VANDYKE, Circuit Judges, dissenting from denial of rehearing en banc:

Once again, the Ninth Circuit endorses the taking of property without just compensation. *See Horne v. U.S. Dep't of Agric.*, 750 F.3d 1128 (9th Cir. 2014), *rev'd sub nom. Horne v. Dep't of Agric.*, 135 S. Ct. 2419 (2015). California property law and Supreme Court precedent make clear that an easement is private property protected by the

Takings Clause.  *See, e.g.*, *L.A. Terminal Land Co. v. Muir*, 136 Cal. 36, 48 (1902); *Nollan v. Cal. Coastal Comm'n*, 483 U.S. 825, 831 (1987).  In opposition to this precedent, the majority concludes there is no taking because the state's appropriation of an easement is not a "permanent physical occupation."  *Cedar Point Nursery v. Shiroma*, 923 F.3d 524, 531–34 (9th Cir. 2019).  This decision not only contradicts Supreme Court precedent but also causes a circuit split.  *See Hendler v. United States*, 952 F.2d 136, 1377–78 (Fed. Cir. 1991).  We should have taken this case en banc so that the Supreme Court will not have to correct us again.

I

The property owners and plaintiffs in this case are Cedar Point Nursery, a strawberry nursery, and Fowler Packing Company, a shipper of table grapes and citrus.  Both companies employ full-time workers and seasonal workers, none of whom live on company property.

The companies abruptly became aware that union organizers claimed a right to trespass on their property in the summer of 2015.  According to Cedar Point, early one morning near the end of the strawberry harvesting season, union organizers entered Cedar Point's property and trespassed across it to the trim sheds, where hundreds of employees were preparing strawberry plants.  The union organizers disrupted work by moving through the trim sheds with bullhorns, distracting and intimidating the workers. Fowler, on the other hand, was able to avoid such an intrusion; when the union organizers attempted to invade Fowler's property, Fowler blocked them.

After these clashes, union organizers filed complaints against both Cedar Point and Fowler with the California

Agricultural Labor Relations Board (the Board), alleging unfair labor practices. The union organizers claimed that they had a statutory right to enter Cedar Point's and Fowler's property based on the Agricultural Labor Relations Act (the Act), Cal. Lab. Code §§ 1140–1166.3. The Act, enacted in 1975, substantially tracks the language of the National Labor Relations Act by giving employees the right to concerted action. *Compare* Cal. Lab. Code § 1152 *with* 29 U.S.C. § 157.

The Act does not authorize non-employees to enter private property. *See, e.g.*, Cal. Lab. Code § 1152. But shortly after the Act went into effect, the Board promulgated an emergency regulation to give union organizers access to the private property of agricultural employers. *See* Cal. Code Regs. tit. 8, § 20900(e). This emergency regulation is sometimes referred to as the "Access Regulation." In promulgating the regulation, the Board relied on a Supreme Court opinion, *N.L.R.B. v. Babcock & Wilcox Co.*, 351 U.S. 105 (1956), which upheld an employer's right to exclude nonemployee union organizers from the employer's private property but also created an exception: the employer's property right must "yield to the extent needed to permit communication of information on the right to organize" when "the location of a plant and the living quarters of the employees place the employees beyond the reach of reasonable union efforts to communicate with them," *id.* at 113; *see Agric. Labor Relations Bd. v. Superior Court*, 16 Cal. 3d 392, 414 (1976) (the Board "predicated its access regulation" on *Babcock & Wilcox*).[1]

---

[1] At the time the California regulation was promulgated, agricultural workers often lived on their employer's property and were cut off from the outside world, so "unions seeking to organize agricultural employees

The current version of the Access Regulation is not limited to situations where union organizers do not have reasonable access to employees.[2]   Rather, it gives union organizers a permanent right to access "the premises of an agricultural employer for the purposes of meeting and talking with employees and soliciting their support."  Cal. Code Regs. tit. 8, § 20900(e).  Union organizers may enter the private property for one hour before the start of work, one hour after the completion of work, and one hour during the lunch break, for 120 days during the calendar year.  Cal. Code Regs. tit. 8, § 20900(e)(3).  Under the regulation, two organizers may enter the owner's property for every 15 employees.  Cal. Code Regs. tit. 8, § 20900(e)(4)(A). The Access Regulation prevents the employer from interfering with the organizers' full access to the property, Cal. Code Regs. tit. 8, § 20900(e)(5)(C), and prohibits the

d[id] not have available alternative channels of effective communication."  Cal. Code Regs. tit. 8, § 20900(c).  The agricultural industry has changed dramatically in the past 40 years, however. "Today, all but a relative handful of workers obtain housing off-farm." Brief of Amicus Curiae Cal. Farm Bureau Fed'n at 8, *Cedar Point v. Shiroma*, 923 F.3d 524 (9th Cir. 2019) (No. 16-16321) (quoting Don Villarejo, Cal. Inst. for Rural Studies, *The Status of Farm Labor Housing* 5 (Mar. 6, 2015), https://bit.ly/36tUs7N).  Moreover, modern technology gives union organizers multiple means of contacting employees. *See id.* at 9.  Given the Supreme Court's more recent narrowing construction of *Babcock & Wilcox* as applying only to "rare case[s]" where the "inaccessibility of employees makes ineffective the reasonable attempts by nonemployees to communicate with them through the usual channels," *Lechmere, Inc. v. N.L.R.B.*, 502 U.S. 527, 537 (1992) (citation omitted), the decades-old justifications for the Access Regulation are questionable.

[2] As Judge Leavy points out in his dissent, *Babcock & Wilcox* does not undermine the plaintiffs' takings claim because their employees are accessible to union organizers through reasonable means of communication.  *Cedar Point*, 923 F.3d at 539 (Leavy, J., dissenting).

union organizers only from injuring crops or machinery, interfering with the employees when they are boarding buses, and similar disruptive behaviors, Cal. Code Regs. tit. 8, § 20900(e)(4)(C).

Cedar Point and Fowler filed this action against members of the Board after union organizers entered (or attempted to enter) their properties pursuant to the Access Regulation, alleging that "the access regulation . . . creates an easement for union organizers to enter . . . private property without consent or compensation," causing an "unconstitutional taking." Cedar Point and Fowler also allege they have reason to believe that union organizers will invoke their right under the Access Regulation to enter their properties in the near future. If not for the regulation, Cedar Point and Fowler allege they would exclude union organizers from their properties. Therefore, they seek a declaration that the Access Regulation is unconstitutional as applied to them and an order enjoining the Board from enforcing the regulation. The district court dismissed the complaint on the ground that the plaintiffs failed to state a plausible Takings Clause claim. *See Cedar Point Nursery v. Gould*, 2016 WL 3549408, at \*5 (C.D. Cal. June 29, 2016).

The plaintiffs appealed, and the panel affirmed, over Judge Leavy's dissent. *See Cedar Point Nursery v. Shiroma*, 923 F.3d 524, 536 (9th Cir. 2019). The majority first acknowledged that Cedar Point and Fowler "allege that the access regulation, as applied to them, effects a Fifth Amendment taking by creating an easement that allows union organizers to enter their property 'without consent or compensation.'" *Id.* at 531. But instead of addressing this takings claim, the majority held (without explanation) that the Access Regulation does not effect a "classic taking in

which government directly appropriates private property." *Id.* (citation omitted).

In light of this conclusion, the majority considered whether the Access Regulation fell within the category of regulatory takings where "the government requires an owner to suffer a permanent physical invasion." *Id.* (citation omitted). The majority held that the plaintiffs had not suffered such a regulatory taking, because, unlike in *Nollan*, union organizers were not allowed to traverse the plaintiffs' property "24 hours a day, 365 days a year." *Id.* at 532. Rather, according to the majority, the Access Regulation merely affected the plaintiffs' "right to exclude," which is only "'one strand of the bundle' of property rights." *Id.* at 533. Accordingly, the majority ruled that the plaintiffs had "not suffered a permanent physical invasion that would constitute a per se taking." *Id.* at 532.[3]

In reaching this conclusion, the majority fundamentally misunderstood the nature of the property rights at issue, and how California had taken them.

## II

Under long-established Takings Clause principles, the analysis of the plaintiffs' complaint should proceed as follows. First, property rights are determined by reference to state law—here, California. Second, California law has long recognized that easements are a traditional form of private property. Third, the Access Regulation appropriates

_____

[3] While suggesting that the Access Regulation might fall within a category of regulatory takings governed by the standards set out in *Penn Central Transportation Co. v. City of New York*, 438 U.S. 104 (1978), the majority did not address this issue because the plaintiffs had not raised it. *Cedar Point*, 923 F.3d at 533–34.

easements from property owners and transfers them to union organizers.   Finally, consistent with Supreme Court precedent, the appropriation of an easement constitutes a taking of "private property" and therefore requires "just compensation."  U.S. Const. amend. V.

## A

Some background is in order.   "Property rights are created by the State."  *Palazzolo v. Rhode Island*, 533 U.S. 606, 626 (2001).   As such, "the existence of a property interest is determined by reference to 'existing rules or understandings that stem from . . . source[s] such as state law.'"  *Phillips v. Wash. Legal Found.*, 524 U.S. 156, 164 (1998) (quoting *Bd. of Regents v. Roth*, 408 U.S. 564, 577 (1972)); *accord United States v. Causby*, 328 U.S. 256, 266 (1946).

Although property rights are defined by state law, there are limits on a state's ability to alter traditional understandings of property through legislation.   *See Palazzolo*, 533 U.S. at 627–28; *Phillips*, 524 U.S. at 167.  "[A]s to confiscatory regulations (as opposed to those regulating the use of property), a State may not sidestep the Takings Clause by disavowing traditional property interests long recognized under state law."  *Phillips*, 524 U.S. at 167.  That is, a state may not, "by ipse dixit, transform private property into public property without compensation."  *Palazzolo*, 533 U.S. at 628 (quoting *Webb's Fabulous Pharmacies, Inc. v. Beckwith*, 449 U.S. 155, 164 (1980)).

Thus, a proper takings analysis begins with a determination of whether there is a traditional property interest at stake.  *See Phillips*, 524 U.S. at 164; *Webb's Fabulous Pharmacies*, 449 U.S. at 162.  Here, a court must

look to California law to make such a determination.  *See Palazzolo*, 533 U.S. at 628; *Phillips*, 524 U.S. at 164.

B

For well over a century, California has recognized that easements are a type of real property.  *See, e.g.*, *L.A. Terminal Land Co. v. Muir*, 136 Cal. 36, 48 (1902).  "An easement is generally defined as an 'interest in land created by grant or agreement, express or implied, which confers a right upon the owner thereof to some profit, benefit, dominion, or lawful use out of or over the estate of another.'" *Mosier v. Mead*, 45 Cal. 2d 629, 632 (1955) (quoting *Muir*, 136 Cal. at 48).  "An affirmative easement gives its owner a right to do something on the land of another, such as a right to pass over the other person's land."  6 Miller & Starr, California Real Estate § 15:9 (4th ed. 2019); *accord Wolford v. Thomas*, 190 Cal. App. 3d 347, 354 (1987); *Balestra v. Button*, 54 Cal. App. 2d 192, 197 (1942).

One type of affirmative easement recognized under California law is an easement in gross.  *See Balestra*, 54 Cal. App. 2d at 197.  An easement in gross is a "personal interest in real estate of another."  *Id.* (citation omitted).  It may be "granted and held though not attached to land."  *Callahan v. Martin*, 3 Cal. 2d 110, 121 (1935) (citation omitted); *accord* Restatement (Third) Property § 1.5(2) (2000).  The Civil Code of California provides examples of easements in gross, including "[t]he right to pasture, and of fishing and taking game," "[t]he right of a seat in church," "[t]he right of burial," "[t]he right of taking rents and tolls," "[t]he right of way," and "[t]he right of taking water, wood, minerals, or other things."  *Gerhard v. Stephens*, 68 Cal. 2d 864, 880 n.11 (1968) (quoting Cal. Civ. Code § 802).  Thus, as the Civil Code's examples indicate, the owner of an easement in gross

may enter the land of another for the purpose of taking some action.

There is a "long line of California cases holding that an easement in gross is real property." *Balestra*, 54 Cal. App. 2d at 197. In California, the owner of such an easement may sell or transfer it like any other form of property. *See* Cal. Civ. Code § 1044; *Callahan*, 3 Cal. 2d at 121; *LeDeit v. Ehlert*, 205 Cal. App. 2d 154, 166 (1962) ("In California an easement in gross is both assignable and inheritable *unless* restricted by proper language to certain individuals."). By the same token, the state's appropriation of an easement in gross is a taking of real property, requiring just compensation.

C

The U.S. Supreme Court has long recognized that an easement in gross is a traditional form of private property that cannot be taken without just compensation. Almost a century ago, the Court held that plaintiffs had sufficiently alleged "that a servitude ha[d] been imposed" on their land,[4] resulting in an "appropriation of property for which compensation should be made," based on allegations that the federal government "set up heavy coast defence guns," intended to fire across the plaintiffs' land, and had done so on occasion "even if not frequently." *Portsmouth Harbor*

---

[4] A "servitude" refers to "encumbrance[s] consisting in a right to the limited use of a piece of land or other immovable property without the possession of it" and "include[s] easements." *Servitude*, Black's Law Dictionary 1577 (10th ed. 2014).

*Land & Hotel Co. v. United States*, 260 U.S. 327, 329–30 (1922) (citation omitted).[5]

Some twenty years later, the Court again held that an "easement was taken" based on "frequent and regular flights of army and navy aircraft over respondents' land at low altitudes." *Causby*, 328 U.S. at 258, 267. The Court first reasoned that under North Carolina law, a landowner had a property right "to the immediate reaches of the superadjacent airspace." *Id.* at 266. Therefore, invasions of that property "are in the same category as invasions of the surface." *Id.* at 265. Because the government's flights were within the airspace owned by the landowners, the Court concluded that an "easement was taken" and the government owed the landowners just compensation. *Id.* at 267. The Court reached this conclusion even though more fact-finding was necessary given that the trial court's "findings of fact contain[ed] no precise description as to [the] nature" of the easement. *Id.* The easement was "not described in terms of frequency of flight, permissible altitude, or type of airplane." *Id.* "Nor [was] there a finding as to whether the easement taken was temporary or permanent." *Id.* Because "an accurate description of the property taken is essential," the Court remanded for additional findings of fact to determine the appropriate amount of the award of compensation. *Id.* at 267–68. In short, once an easement is taken, the remaining

---

[5] Contrary to the concurrence in the denial of the petition for rehearing en banc (hereinafter, the "Concurrence"), *Portsmouth Harbor* did not focus on whether the servitude "result[ed] in depriving the owner of all profitable use." Concurrence at 5. Rather, the government's intent to use the plaintiffs' land and its overt acts in doing so were enough to create a servitude. 260 U.S. at 329–30; *see also Causby*, 328 U.S. at 261–62 (holding that there is "no material difference" between a case where an owner is prevented from "us[ing] th[e] land for any purpose" and one where the "use of the land [is] not completely destroyed").

question is the amount of just compensation, which is determined based on the nature of the easement.

Over three decades later, the Court held that there was a taking of private property when the government claimed that a marina owner was required to open its lagoon to the public on the ground that the lagoon was subject to a "navigational servitude." *Kaiser Aetna v. United States*, 444 U.S. 164, 170 (1979). The Court explained that the government could not open the lagoon to the public "without invoking its eminent domain power and paying just compensation" because there is a taking even if the government "physically invades only an easement in property." *Id.* at 180 (citing *Causby*, 328 U.S. at 265; *Portsmouth Harbor*, 260 U.S. 327). Although *Kaiser Aetna* referred to the government's imposition of a navigational servitude as a taking "under the logic" of *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393 (1922), as well as "an actual physical invasion" comparable to the traditional taking of a fee interest, *Kaiser Aetna*, 444 U.S. at 178, 180, the Court has subsequently construed *Kaiser Aetna* as holding that there is a taking when the government imposes a "navigational servitude on [a] marina created and rendered navigable at private expense," *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1029 (1992).

To the extent there was any doubt as to whether the appropriation of an easement constitutes a taking, it was dispelled by *Nollan*.[6] There, the Court stated that if California were to require landowners to "make an easement

---

[6] *Nollan* and *Dolan v. City of Tigard* upheld the government's right to "exact some forms of dedication as a condition for the grant of a building permit." *Dolan v. City of Tigard*, 512 U.S. 374, 385–86 (1994). But the "authority of state and local governments to engage in land use planning," *id.* at 384, is not at issue here.

across their beachfront available to the public," there is "no doubt there would . . . be[] a taking." *Nollan*, 483 U.S. at 831. According to the Court, "[t]o say that the appropriation of a public easement across a landowner's premises does not constitute the taking of a property interest but rather . . . 'a mere restriction on its use,' is to use words in a manner that deprives them of all their ordinary meaning." *Id.* (citation omitted).[7]

The Federal Circuit's decision in *Hendler v. United States*, 952 F.2d 1364 (Fed. Cir. 1991), is in accord with these precedents. There, the Federal Circuit held that the federal government had acquired an uncompensated easement when "Government vehicles and equipment entered upon plaintiffs' land from time to time, without permission, for purposes of installing and servicing . . . various [groundwater] wells." *Id.* at 1377.[8] Entry onto private property, "even though temporally intermittent," effected a taking because "the concept of permanent physical occupation does not require that in every instance the occupation be exclusive, or continuous and uninterrupted." *Id.* It was sufficient that the vehicles "entered upon [the]

---

[7] A treatise on which *Nollan* relied, *see* 483 U.S. at 831, explains that both existing easements and "new easements carved out of the unencumbered fee" are "subject to the power of eminent domain," and "[a]ll of these interests must be paid for when the property is acquired through eminent domain," 2 Julius L. Sackman, Nichols on Eminent Domain § 5.01 (3rd ed.) (emphasis added).

[8] In a different section of the opinion, the Federal Circuit also concluded that placing the wells on the plaintiffs' land gave rise to an "occupancy . . . within the degree necessary to make out a taking." *Hendler*, 952 F.2d at 1377; *compare id.* at 1375–77 (analyzing the government's placement of wells on the plaintiffs' property) *with id.* at 1377–78 (analyzing the government's entry onto the plaintiffs' land to install and service the wells).

plaintiffs' land from time to time," "remained on the land for whatever duration was necessary to conduct their activities, and then left, only to return again when the Government desired." *Id.* The Federal Circuit reasoned that *Nollan* and *Kaiser Aetna* left "little doubt" that "dr[iving] . . . upon [the] plaintiffs' land for the purpose of installing and periodically servicing and obtaining information from . . . various wells," though "temporally intermittent," constituted a taking. *Id.* at 1377–78.

In sum, the Supreme Court has repeatedly, and consistently, recognized that the appropriation of an easement that allows for entry onto private property constitutes a taking of property. And the Court has expressly recognized that taking an easement in California is, by definition, an "appropriation" of "property," not a "mere restriction" on use. *Nollan*, 483 U.S. at 831 (citation omitted). Indeed, "[t]he clearest sort of taking occurs when the government encroaches upon or occupies private land for its own proposed use." *Palazzolo*, 533 U.S. at 617. The Federal Circuit has recognized this as well. *See Hendler*, 952 F.2d at 1378. Only the Ninth Circuit refuses to acknowledge that taking an easement is a taking.

D

Here, the plaintiffs have plausibly alleged that California took their property—specifically, easements in gross—by means of the Access Regulation.

As the Court has explained, "the classic taking is one in which the government directly appropriates private property for its own use." *Horne v. Dep't of Agric.*, 135 S. Ct. 2419, 2425 (2015) (cleaned up). "[I]n the case of real property, such an appropriation is a per se taking that requires just compensation." *Id.* at 2426. Thus, the sole question is

whether the government has "appropriate[d] private property for its own use." *Id.* at 2425. If so, there "is a per se taking that requires just compensation." *Id.* at 2426.

The right to enter onto the land of another to take some action is the epitome of an easement in gross. *See, e.g.*, Cal. Civ. Code § 802; *Nollan*, 483 U.S. at 832 & n.1; *Buehler v. Or.-Wash. Plywood Corp.*, 17 Cal. 3d 520, 527 (1976); *LeDeit*, 205 Cal. App. 2d at 159, 165–67. The Access Regulation gives multiple union organizers the right to enter onto employers' private property to "meet[] and talk[] with employees and solicit[] their support" for three hours a day, 120 days a year. Cal. Code Regs. tit. 8, § 20900(e). The Access Regulation limits a union organizer's rights to enter private property to some extent, *see* Cal. Code Reg. tit. 8, § 20900(e), but that does not detract from the conclusion that it appropriates easements; indeed, restrictions are a quintessential feature of all easements.[9] Accordingly, we have the "classic taking" described in *Horne*. 135 S. Ct. at 2425. It is irrelevant that the property taken is an easement—as opposed to some other type of real or personal property—because the Takings Clause "protects 'private property' without any distinction between different types." *Id.* at 2426. Because California has "appropriate[d] private property for its own use," there has been "a per se taking that requires compensation." *Id.* at 2425–26. No additional showing is required. *See id.* Thus, the majority errs in concluding that the plaintiffs fail to plausibly allege that their

---

[9] *See, e.g.*, Cal. Civ. Code § 806 (extent of an easement is "determined by the terms of the grant, or the nature of the enjoyment by which it was acquired"); *Youngstown Steel Prods. Baker v. Pierce*, 100 Cal. App. 2d 224, 226 (1950) ("No authority need be cited for the well-known rule that the owner of a dominant tenement must use his easement and rights in such a way as to impose as slight a burden as possible on the servient tenement.").

rights under the Takings Clause were violated.  *See Cedar Point*, 923 F.3d at 531–33.

### III

The majority's failure to recognize that the plaintiffs have stated a viable takings claim is based on several fundamental errors.

### A

First, the majority ignores the plaintiffs' claim that California has directly appropriated their property and instead suggests that the plaintiffs' claim must fall into one of "three categories of regulatory action[s]" which are "functionally equivalent to the classic taking."  *Id.* at 531 (quoting *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 536 (2005)).  The three categories identified by the majority are: (1) "where government requires an owner to suffer a permanent physical invasion of her property—however minor," (2) where regulations "completely deprive an owner of 'all economically beneficial us[e]' of her property," and (3) "the remainder of regulatory actions, which are governed by the standards set forth in *Penn Central Transportation Co. v. New York City*."  *Id.* (citations omitted).  The majority then focuses on the first of these three categories of "regulatory actions," characterized as a "permanent physical invasion."  *See id.* at 531–34.

This re-characterization of the plaintiffs' claims is wrong on its face.  The plaintiffs' complaint expressly alleges that they have suffered what the majority refers to as a "classic taking," namely that "the access regulation . . . creates an easement for union organizers to enter . . . private property without consent or compensation," causing an "unconstitutional taking."  As the Supreme Court has

explained, separate and apart from any categories of regulatory takings, "[t]he paradigmatic taking requiring just compensation is a direct government appropriation . . . of private property." *Lingle*, 544 U.S. at 537. Thus, the majority errs by attempting to rewrite the plaintiffs' claim that California has directly appropriated their property into a claim that regulatory activity has gone too far by causing a permanent occupation of their land. *See Cedar Point*, 923 F.3d at 533–34.

B

The majority also errs in concluding that the Access Regulation does not effect a taking because it "does not grant union organizers a 'permanent and continuous right to pass to and fro' such that the [plaintiffs'] property 'may continuously be traversed.'" *Id.* at 532. There is no support for the majority's claim that the government can appropriate easements free of charge so long as the easements do not allow for access "24 hours a day, 365 days a year." *Id.*

First, an easement need not allow for a "continuous physical occupation" for it to be taken. It is well established that an easement holder's right to go onto property of another exists regardless whether the easement holder permanently occupies the property. *Loretto* itself recognizes that *Portsmouth Harbor*, *Causby*, and *Kaiser Aetna*—cases in which there was no permanent physical occupation—stand for the proposition that the government must pay compensation even if it "physically invades only an easement in property." *Loretto*, 458 U.S. at 433 (citation omitted). And *Loretto* recognizes that "[t]he one incontestable case for compensation (short of formal expropriation) seems to occur when the government deliberately brings it about that its agents, or the public at

large, regularly use . . . a thing [such as an easement][10] which . . . was understood to be under private ownership." *Id.* at 427 n.5 (cleaned up) (quoting Frank I. Michelman, *Property, Utility & Fairness: Comments on the Ethical Foundations of 'Just Compensation' Law*, 80 Harv. L. Rev. 1165, 1184 (1967)).

Similarly, *Nollan* held that imposing an easement across a property owner's beachfront property effectively gave rise to a "permanent physical occupation," as in *Loretto*, "even though no particular individual [was] permitted to station himself permanently upon the premises." 483 U.S. at 832. And, as the dissent in *Nollan* pointed out, "public passage for a portion of the year would either be impossible or would not occur on appellant's property" due to "high-tide line shifts throughout the year." *Id.* at 854 (Brennan, J., dissenting). Put simply, the Supreme Court has never held that a government has free rein to take easements, without paying for them, so long as the easements do not allow for access "24 hours a day, 365 days a year." *Cedar Point*, 923 F.3d at 532. Thus, the majority errs by engrafting a "continuous use" requirement onto the Takings Clause.

Second, an easement need not be "permanent" for it to be taken, contrary to the majority's repeated invocation of

---

[10] The law review article from which *Loretto* quotes makes clear that the word "'thing' signifies any discrete, identifiable (even if incorporeal) vehicle of economic value which one can conceive of as being owned," including "easements," and that these "things" "can be affirmatively expropriated by public authority in a manner analogous to its 'taking' of a corporeal thing." Michelman, *supra* at 1184 n.37. That is, even though easements "[h]ave a conceptual existence but no physical existence," *Incorporeal*, Black's Law Dictionary 884 (10th ed. 2014), they can be affirmatively expropriated (i.e., taken) just like a piece of land or an object.

that word. *See Cedar Point*, 923 F.3d at 531–34. In *Causby*, the Court made clear that there was a taking even though the trial court had not yet determined whether the "easement taken [was] a permanent or a temporary one." 328 U.S. at 268; *see also Ark. Game & Fish Comm'n v. United States*, 568 U.S. 23, 33 (2012) ("[W]e have rejected the argument that government action must be permanent to qualify as a taking."); *First English Evangelical Church of Glendale v. L.A. Cty., Cal.*, 482 U.S. 304, 329 (1987) ("A temporary interference with an owner's use of his property may constitute a taking for which the Constitution requires that compensation be paid."). Thus, there is no basis for the majority's conclusion that the government can take easements without paying compensation so long as the easements do not meet the majority's definition of "permanent."

In holding that the plaintiffs' claim fails because there is no "permanent physical occupation," the majority creates a circuit split by contradicting the Federal Circuit's decision in *Hendler*. The Federal Circuit's holding that activity involving "temporally intermittent" intrusions onto private property effects a taking, *Hendler*, 952 F.2d at 1377, is inconsistent with the majority's view that there is no taking of an easement unless "random members of the public [can] unpredictably traverse the[] property 24 hours a day, 365 days a year," *Cedar Point*, 923 F.3d at 532.[11]

---

[11] As previously explained, *see supra* at 20 n.8, *Hendler* analyzed the entry of the federal officials onto the land separately from the government's installation of the wells. *Compare* 952 F.2d at 1375–77 (analyzing the government's placement of wells on the plaintiffs' property), *with id.* at 1377–78 (analyzing the government's entry onto the plaintiffs' land to install and service the wells). Accordingly, the Concurrence errs in attempting to distinguish *Hendler* on the ground that

C

Finally, the majority blunders in relying on *PruneYard Shopping Center v. Robins*, 447 U.S. 74 (1980), to support its conclusion that the Access Regulation does not effect a taking, *see Cedar Point*, 923 F.3d at 531–32. In *PruneYard*, the appellants were owners of "a large commercial complex that cover[ed] several city blocks, contain[ed] numerous separate business establishments, and [was] open to the public at large." 447 U.S. at 83. The owners ordered a group of high school students who were distributing literature and soliciting signatures for a petition to leave the premises. *Id.* at 77. The California Supreme Court held that the state constitution protected speech and petitioning, even at privately owned shopping centers, and therefore concluded that the students were entitled to conduct their activity on the private property. *Id.* at 78 (citing *Robins v. Pruneyard Shopping Ctr.*, 23 Cal. 3d 899, 910 (1979)). The U.S. Supreme Court affirmed, characterizing the state constitutional requirement as a regulatory restriction that did not go so far as to constitute a taking. *Id.* at 82–85.

According to the majority, *PruneYard* "contradict[s]" the plaintiffs' claim that the Access Regulation appropriates their property, because *PruneYard* involved restrictions on a property owner's "right to exclude" individuals from property and the Court held that there was no taking. *Cedar Point*, 923 F.3d at 531–32. This reliance on *PruneYard* is mistaken.

*PruneYard* did not involve a state law that gave third parties access to otherwise private property; rather, the

---

the Federal Circuit was considering only the permanent trespass caused by the installation of the wells. *Cf.* Concurrence at 8–9.

owner in *PruneYard* "had already opened his property to the general public." *Nollan*, 483 U.S. at 832 n.1. Indeed, *PruneYard* framed the issue as "whether state constitutional provisions, which permit individuals to exercise free speech and petition rights on the property of a privately owned shopping center *to which the public is invited*, violate the shopping center owner's property rights under the Fifth . . . Amendment." 447 U.S. at 76–77 (emphasis added). Given that the shopping center was open to the public, it is not surprising that the parties did not argue, and the Supreme Court did not consider, whether the state had appropriated an easement by giving members of the public the right to exercise their "state-protected rights of free expression and petition" on the shopping center property. *Id.* at 83.

The Supreme Court subsequently made clear that *PruneYard* does not provide guidance for analyzing a governmental appropriation of an easement. *Dolan v. City of Tigard* distinguished the imposition of a permanent recreational easement from the situation in *PruneYard*, where the property was already open to the public and "attracted more than 25,000 daily patrons." 512 U.S. 374, 394 (1994); *see also Nollan*, 483 U.S. at 832 n.1 (distinguishing the appropriation of a beachfront easement from the situation in *PruneYard* where the owner "had already opened his property to the general public," individuals were not given permanent access to the property, and there was no "classic right-of-way easement").**[12]** And,

---

**[12]** The word "permanent" has carried a variety of different meanings in takings jurisprudence, and its meaning has changed over time. *See Causby*, 328 U.S. at 267 (referring to "temporary" and "permanent" easements); *Loretto*, 458 U.S. at 421 (referring to a "permanent physical occupation"); *Hendler*, 952 F.2d at 1376 ("'[P]ermanent' does not mean forever, or anything like it"); *Ark. Game & Fish Comm'n*, 568 U.S. at 33 (rejecting the "argument that government action must be permanent to

as *Horne* made clear, "limiting a property owner's right to exclude certain speakers from an already publicly accessible shopping center did not take the owner's property." 135 S. Ct. at 2429 (citing *PruneYard*, 447 U.S. at 83).

Here, unlike in *PruneYard*, the plaintiffs' property is not "open to the public at large," 447 U.S. at 83, and the plaintiffs expressly alleged that the Access Regulation appropriates easements. California has not merely regulated the "right to exclude" certain persons from property that is open to the public based on their speech, as in *PruneYard*; rather, California has appropriated a state-defined property right. Therefore, *PruneYard* is simply inapplicable: The majority's fails to recognize that *PruneYard* did not involve the taking of easements but rather a restriction on a landowner's ability to prevent speech on land that was already open to the public.

IV

"That rights in property are basic civil rights has long been recognized," *Lynch v. Household Fin. Corp.*, 405 U.S. 538, 552 (1972), and like other civil rights must be zealously protected from infringement by government. Here, the plaintiffs allege that California has appropriated easements and thus taken valuable property rights protected by the Takings Clause. To say, as the majority does, that there has not been a taking, "is to use words in a manner that deprives them of all their ordinary meaning." *Nollan*, 483 U.S. at 831. By failing to give fair consideration to the plaintiffs' actual claims, the majority creates a circuit split, disregards binding

---

qualify as a taking"); *Cedar Point*, 923 F.3d at 533 (referring to a "permanent per se taking"). But there has been no change in the Supreme Court's view that the taking of an easement, whether "temporary" or "permanent," constitutes a taking. *Causby*, 328 U.S. at 267.

Supreme Court precedent, and deprives property owners of their constitutional rights.  We should have taken this case en banc to rectify this error.